## MAGONE *v.* HELLER.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 47. Argued October 19, 20, 1893. — Decided October 30, 1893.

Under the tariff act of 1883, a kind of sulphate of potash, the only common use of which, either by itself or in combination with other materials, is as manure or in the manufacture of manure, is within the clause of the free list which exempts from duty "all substances expressly used for manure;" and is not within the clause of "Schedule A. — Chemical Products," which imposes a duty on "potash, sulphate of, twenty per centum ad valorem."

THIS was an action brought, after due protest and other proceedings, by the members of a firm of importers against the collector of the port of New York, to recover back duties assessed and levied by the collector under the tariff act of March 3, 1883, c. 121, upon three importations in 1887 of an article invoiced as "manure salts," which the collector held to come within the clause "Potash, sulphate of, twenty per centum ad valorem," in "Schedule A. — Chemical Products," and which the plaintiffs claimed to be exempt from duty under the free list as a substance "expressly used for manure." 22 Stat. 493, 515.

At the trial, one of the plaintiffs testified that the article (of which he produced samples) was a manure salt, made in Saxony, from a substance there mined and known as "kainit," by crushing and washing or leaching so as to extract the parts of no use as fertilizers, leaving sulphate of potash, and then burning and grinding it in a mill, but not calcining it; that the plaintiffs sold all the importations to manufacturers of fertilizers, and had imported the article since 1882; that, "so far as his knowledge went, similar articles were used expressly for fertilizers and manures; that his firm sold them to fertilizer manufacturers expressly;" that "he did not say that these articles were directly applied to the ground for crops; that they were so applied; but they were generally used in other ways;" that they contained 90 to 95 per cent of sul-

phate of potash, and more than 40 per cent of pure potash; that the price was estimated according to the amount of sulphate of potash, as shown by foreign analysis; and that his firm dealt in manure salts, and not in sulphate of potash.

On cross examination, he persisted in the last statement, after being shown a business card of his firm (afterwards proved to have been obtained at their place of business a few days before the trial) which stated that they dealt in "sulphate of potash, muriates of potash, kainit, kieserit, mineral phosphates, acid phosphate, and all other fertilizing materials."

Several wholesale dealers in drugs and chemicals, called by the plaintiffs, testified that they knew and dealt in chemically pure sulphate of potash, (of which they produced samples,) but did not recognize or deal in the substance of which samples had been produced by the plaintiffs.

Some manufacturers of fertilizers and dealers in fertilizing materials, called by the plaintiffs, testified that this substance was bought and sold as "sulphate of potash," and as "manure salts;" that it was generally used in the manufacture of fertilizers, mixing it with other materials; that it was sometimes sold to farmers for fertilizing purposes; and that they did not know of its being used for any other purpose.

An analytic and consulting chemist, called by the plaintiffs, testified that the article " was known in commerce as high grade manure salt or high grade sulphate of potash;" "that he did not know the predominating name under which they were sold; that they were called sulphate of potash and high grade manure salt; that the term manure salt was applied to perhaps only three articles, kainit, sulphate of potash (so called) or the double sulphate of potash and magnesia, and muriate of potash and kieserit; that the articles in suit, as far as he knew, were generally used in the manufacture of fertilizers;" and that any of the chemicals used in fertilizers would not injure vegetation, if mixed with something else, or lightly sprinkled on the soil, but would if applied in large quantities.

The same witness testified that the article was also used in the manufacture of alum, and of nitrate of potash for making

gunpowder; and witnesses called by the defendant testified that it was used for making alum, refined potash, and bichromate of potash.

An analytical chemist, called by the defendant, testified that he had made analyses of the samples produced by the plaintiff, showing that they contained from 49.19 per cent of potash and 91.05 per cent of sulphate of potash to 51.62 per cent of potash and 95.67 of sulphate of potash; that the chemical difference between these samples and those produced by the other witnesses for the plaintiffs was only in the degree of purity, the former containing a small amount of muriates; and that the two articles were two kinds of the same substance — sulphate of potash.

The defendant moved the court to direct the jury to return a verdict for the defendant, on these grounds: 1st. That the article in suit is provided for in the tariff act of 1883 *eo nomine* as "sulphate of potash." 2d. That the clause "all substances expressly used for manure" means only substances used for or as manure, and not substances used in the manufacture of manure or fertilizers. 3d. That this article is "sulphate of potash," and is provided for in said tariff act *eo nomine* as "sulphate of potash," a specific expression; and therefore, even if otherwise covered by the general expression "all substances expressly used for manure," is not provided for under such general expression. 4th. That the plaintiffs had not proved facts sufficient to enable them to recover. The court denied the motion, and the defendant excepted.

The defendant then moved the court to allow the case to go to the jury upon the question whether the article in suit was a "substance expressly used for manure." The court denied this motion also, and the defendant again excepted.

The jury returned a verdict for the plaintiffs by direction of the court. 38 Fed. Rep. 908. Judgment was rendered on the verdict, and the defendant, on October 16, 1886, sued out this writ of error.

*Mr. Assistant Attorney General Whitney* for plaintiff in error.

*Mr. Edwin B. Smith* for defendants in error.

MR. JUSTICE GRAY, after stating the facts, delivered the opinion of the court.

The tariff act of 1883, in "Schedule A. — Chemical Products," imposes duties on various compounds of "Potash," including "Nitrate of, or saltpetre, crude, one cent per pound. Nitrate of, or refined saltpetre, one and one-half cents per pound. Sulphate of, twenty per centum ad valorem." "Bichromate of potash, three cents per pound." 22 Stat. 493.

Among the articles exempt from duty by the free list of the same act are the following: "Bone dust and bone ash for manufacture of phosphate and fertilizers. Carbon, animal, fit for fertilizing only. Guano, manures, and all substances expressly used for manure." 22 Stat. 515.

Congress, for the promotion of agriculture, evidently intended that if a substance, which might be described by the name of an article subject to duty under Schedule A, was within the description, in the free list, of use for fertilizing the ground, it should be exempt from duty.

This is manifest from the clause in the free list, immediately preceding that now in question, "Carbon, animal, fit for fertilizing only," as well as from the clause further on in the same list, "Phosphates, crude or native, for fertilizing purposes." 22 Stat. 517. Animal carbon and crude or native phosphates are both chemical products; yet if the carbon is "fit for fertilizing only," or the phosphate is "for fertilizing purposes," it is clearly intended to come in free, notwithstanding Schedule A imposes a duty on "all chemical compounds and salts, by whatever name known, and not specially enumerated or provided for in this act, twenty-five per centum ad valorem." 22 Stat. 494; *Mason* v. *Robertson*, 139 U. S. 624.

So, by force of the very clause in question, "all substances expressly used for manure," must be exempt from duty, even if they are chemical products, and are scientifically classed as

one kind of an article the name of which appears in Schedule A, or are spoken of in commerce by that name. The agricultural use must prevail over the scientific or commercial nomenclature.

The real question, therefore, is what is the true meaning, in this clause, of the words "expressly used for manure?"

While the adverb "expressly," in its primary meaning, denotes precision of statement, as opposed to ambiguity, implication, or inference, and is equivalent to "in an express manner," or "in direct terms," it is also commonly used to designate purpose, and as equivalent to "especially," or "particularly," or "for a distinct purpose or object."

In Webster's Dictionary, for instance, the definition of "expressly" is: "In an express manner; in direct terms; with distinct purpose; particularly; as, a book written *expressly* for the young." And the further illustration is added from Shakespeare: "I am sent *expressly* to your lordship."

The phrase "substances expressly used for manure," was in the enumeration of articles specified as exempt from duty in earlier tariff acts, and may have been retained in the act of 1883 for that reason. See Acts of March 3, 1857, c. 98, § 3, 11 Stat. 194; March 2, 1861, c. 68, § 23, 12 Stat. 196; Rev. Stat. § 2505.

The qualifying words are not "expressly intended for use as manure," or "expressly imported for use as manure," or "in fact to be used as manure," and cannot therefore be tested by the intention of the importer, or by the use to which the goods are afterwards actually put. But the words are "expressly used for manure," and the question whether the imported articles come within the description is to be determined at the time of importation.

"Manures" having been already specified in the same clause, the words in question cannot be limited to substances used as manure in the very condition in which they are imported; but must, according to a natural meaning of the word "for," include not only all substances expressly used

as manure, but also substances expressly used, either by themselves or in combination with other materials, in making manure.

The result of these considerations is that, in this act, the phrase "expressly used for manure" is equivalent to "used expressly," or "particularly," or "especially" for manure; and denotes those substances, the only common use of which, either by themselves, or in combination with other materials, is for the purpose of fertilizing the soil.

If the only common use of a substance is to be made into manure, or to be itself spread upon the land as manure, the fact that occasionally, or by way of experiment, it is used for a different purpose, will not take it out of the exemption. But if it is commonly, practically and profitably used for a different purpose, it cannot be considered as "expressly used for manure," even if in the majority of instances it is so used. To hold otherwise would be to extend to other industries an exemption intended for the benefit of agriculture only.

In the present case, the article imported was, chemically considered, "sulphate of potash," though not quite pure. There was testimony tending to show that it was bought and sold by that name, and as "manure salts," by manufacturers of fertilizers and dealers in fertilizing materials; that it was used expressly for fertilizers and manures; that it was generally used, mixed with other materials, for the manufacture of fertilizers; and that it was sometimes sold to farmers to be used as manure. But there was other testimony to the effect that it was also used in the manufacture of alum, as well as of refined potash, nitrate of potash, and bichromate of potash.

Such being the state of the case, it was a question of fact, to be determined by the jury, upon consideration of all the evidence and of the comparative credibility of the witnesses, whether the article was "expressly used for manure," in the sense above defined.

It follows that the judge rightly refused to direct a verdict for the defendant; but that he erred in denying the defend-

ant's request to submit the case to the jury, and in directing a verdict for the plaintiffs. For this error

*The judgment is reversed, and the case remanded, with directions to set aside the verdict and to order a new trial.*

MR. JUSTICE BREWER dissented.

MR. JUSTICE BROWN was not present at the argument, and took no part in the decision.