WISE v. CHEW HING LUNG et al.

(Circuit Court of Appeals, Ninth Circuit. October 4, 1897.)

No. 362.

CUSTOMS DUTIES—CLASSIFICATION—TAPIOCA FLOUR.

"Tapioca flour," which is made from the root of the shrub variously known as the manihot, cassava, manioc, or mandioc, was dutiable, under the tariff act of 1890, as a preparation, "from whatever substance produced, fit for use as starch," under paragraph 323, and was not free of duty as "tapioca, cassava, or cassady," under paragraph 730; it appearing that the article is fit for, and is principally used in the United States, as a starch. 77 Fed. 734, reversed. Townsend v. U. S., 5 C. C. A. 489, 56 Fed. 222, distinguished.

Appeal from the Circuit Court of the United States for the Northern District of California.

Saml. Knight, Asst. U. S. Atty., for appellant.
Page, McCutcheon & Eells, for appellee.

Before ROSS and MORROW, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The question in this case is whether certain merchandise imported into this country at the port of San Francisco is governed by the provisions of paragraph 323, or by those of section 2 of paragraph 730, of the tariff act of 1890. Paragraph 323 reads: "Starch, including all preparations, from whatever substance produced, fit for use as starch, two cents per pound." Section 2 of paragraph 730 is as follows: "Tapioca, cassava, or cassady, free." The board of appraisers admitted the merchandise free, and its decision was, on appeal to the circuit court, affirmed. 77 Fed. 734. From that decision the present appeal is brought by the collector.

It appears from the findings of the court below, which were largely based upon stipulation of the respective parties, that the importation in question consists of starch grains contained in and derived from

the root botanically known as jatropha manihot; that in the West Indies this root is known as cassava or manioc; in Brazil, as mandioc, —all of which names indicate the same thing, without any change of condition or character. The manihot, cassava, manioc, or mandioc, by whichever name called, is a shrub, of which there are at least two varieties. The root of the sweet cassava may be eaten with impunity; that of the bitter, which is most extensively cultivated, abounds in an acrid, milky juice, which renders it highly poisonous if eaten in the recent state. Both varieties contain a large proportion of starch. The starchy substance constituting the importations involved in the present controversy consists of the starch grains obtained from the manihot root by washing, scraping, and grating or disintegrating it into a pulp, which, in the bitter variety, is submitted to pressure, so as to separate therefrom the deleterious juices. The starch grains settle, and the juice is subsequently decanted, leaving as a deposit a powder, which, after repeated washings with cold water, and after being dried, is nearly pure starch, and is insoluble in cold water. This is the substance constituting the importations under consideration. If sufficient heat and motion are afterwards applied to this substance, a mechanical change takes place, the grains become fractured, and thereby agglutinated. This latter substance is partly soluble in cold water, and is granulated tapioca, known in commerce as pearl and flake tapioca. The importations in question were from China, made between November 2, 1893, and June 6, 1894, and were made chiefly for the purpose of supplying Chinese laundrymen, who use the article as starch, and to a slight extent also for food purposes. Its use for such purposes is, however, limited to the Chinese, except that in some instances, in San Francisco, this substance is used for starch purposes in their business by white laundrymen, by mixing it with wheat or corn starch. Wheat and corn and potato starches are the starches commonly used in the United States. The substance in question is not imported into San Francisco by others than Chinese. Among the white people dealing with the Chinese on the Pacific coast the substance is commonly known as "Chinese starch." In the general markets of the United States it is commercially known as "tapioca flour." In those markets the term "tapioca" includes that article in three forms, viz. flake tapioca, pearl tapioca, and tapioca flour. The same substance is imported from China, and used in the Eastern states for starch purposes,—by calico printers and carpet manufacturers to thicken colors, for bookbinding, in the manufacture of paper, filling in painting, manufacture of a substitute for gum arabic and other gums, and also as an adulterant in the manufacture of candy and other articles. The court below further found that:

"The article in question is fit for use as starch in laundry work, in the sense that by its use clothes can be starched: but it is not commonly used in such work as starch throughout the United States, and is not known to be so used except on the Pacific coast, as hereinbefore stated."

A precisely similar article was under consideration by the circuit court of appeals for the Second circuit in 1893. Townsend v. U. S., 5 C. C. A. 489, 56 Fed. 222. The evidence presented to the court in

that case failed to show that the article in question was a preparation fit for use as starch. The court concluded its opinion in these words:

"If tapioca flour was, in our opinion, a preparation fit for use as starch, the question would have arisen whether it was specially provided for under paragraph 323; but, the conclusion being that it was not such a preparation, it has a place only in the free list."

The testimony there was such that the court said:

"The article has never been sold as a starch, and is not considered in this country as adapted to the ordinary purposes of that article, and has never been manufactured into commercial starch, but it is chemically a starch. The term 'preparations fit for use as starch' means preparations which are actually, and not theoretically, fit for such use; which can be practically used as such, and not which can be made, by manufacture, fit for such use. Tapioca flour is used for purposes which are analogous to those for which starch is used. It is not used, though it probably could, by adequate preparation, be used, for the same purposes, unless its use as a sizing can be called the same purpose. The testimony of the witness upon that subject was not sufficient to justify the stress which the board of general appraisers placed upon it. The very suggestive evidence of the unsuitableness of tapioca for commercial use as starch is that, although it is much cheaper than starch made in this country, it does not come into commercial competition with starch made here." 5 C. C. A. 490, 56 Fed. 224.

In the case at bar the evidence is, and the court so found, that with the imposition of a duty of two cents a pound the cost of the article in question has been substantially as great as that of ordinary starches; a little more than that of the cheapest, and a little less than that of the best, starches. A comparison of the facts as made to appear in the Townsend Case with those established in the case at bar very clearly shows that they are almost entirely dissimilar, except in respect to the fact that the article in question is, chemically, almost a pure starch. In the present case it is shown that it is not only chemically almost a pure starch, but that it is commercially known on the Pacific coast as "Chinese starch," and is largely used by the Chinese for the starching and stiffening of clothes, and to some extent by white people in their laundry work. It is further shown in the present case that the same article is imported from China, and used in the Eastern states for starch purposes,—by calico printers and carpet manufacturers to thicken colors, in the manufacture of paper for bookbinding, filling in painting, manufacture of a substitute for gum arabic and other gums, and also as an adulterant in the manufacture of candy and other articles. The evidence and findings in the present case not only show that the article in question is a preparation fit for use as starch, but that its chief use in the United States is as a starch, and that only to a very limited extent is it used for food purposes.

The case here presented for decision is, therefore, very different from that before the circuit court of appeals for the Second circuit, entitled "Townsend v. U. S." The court here must decide, as the court there did, upon the facts before it. This is by no means saying that the tariff law means one thing in San Francisco and another in New York. Tariff laws are laws of general application, and are made, not for the government of particular ports, but for the government of

the whole country, including all of its ports. But courts do not make facts. They find them, when called upon to do so, upon legal evidence properly introduced, and upon the facts as thus established their judgment must be based. Tapioca flour being here shown to be a preparation fit for use as starch, the question arises, which the circuit court of appeals for the Second circuit said did not arise in the Townsend Case, whether it was specially provided for under paragraph 323 of the act of 1890. It will be well to insert again the two clauses of the act in question. Paragraph 323: "Starch, including all preparations, from whatever substance produced, fit for use as starch, two cents per pound." Section 2 of paragraph 730: "Tapioca, cassava or cassady, free." That the article under consideration is prepared from the root of the mandioc plant, and is its first product, is conceded. Being a flour, it is a root flour. The application of a certain degree of heat and of motion to the flour will convert it into the flake and pearl tapioca, respectively, of commerce. These are well-known food products, and clearly entitled to free entry, under section 2 of paragraph 730 of the act of 1890. Does the fact shown by the findings and evidence, that in the general trade of the United States the term "tapioca" is understood to include the flour as well as flake and pearl tapioca, entitle the flour to free entry also? That is undoubtedly so, unless congress in the act in question has made a specific provision covering the flour, for the rule is well settled that in tariff legislation the designation of an article eo nomine must prevail over a general description that would otherwise embrace it. Homer v. Collector, 1 Wall. 486; Reiche v. Smythe, 13 Wall. 162; Movius v. Arthur, 95 U. S. 144; Arthur v. Lahey, 96 U. S. 112; Arthur v. Rheims, Id. 143. But a name under which an article is commercially known will not control a specific provision respecting it. Magone v. Heller, 150 U. S. 70, 14 Sup. Ct. 18. In that case certain provisions of the tariff act of 1883 were involved. "Schedule A— Chemical Products," of that act, imposed duties on various compounds of "potash," including "nitrate of, or saltpetre, crude, one cent per pound. Nitrate of, or refined saltpetre, one and one-half cents per pound. Sulphate of, twenty per centum ad valorem." "Bichromate of potash, three cents per pound." 22 Stat. 493. Among the articles exempt from duty by the free list of the same act were the following: "Bone dust and bone ash for manufacture of phosphate and fertilizers. Carbon, animal, fit for fertilizing only. Guano, manures and all substances expressly used for manures." Id. 515. The court said: "Congress, for the promotion of agriculture, evidently intended that, if a substance which might be described by the name of an article subject to duty under Schedule A was, within the description in the free list, of use for fertilizing the ground, it should be exempt from duty;" and, accordingly, whether the article which was there the subject of importation, and which was chemically "sulphate of potash" was entitled to free entry or not, was made to depend upon whether it was "expressly used for manure" in the sense defined by the court. As has been seen, congress, by the act here under consideration, put tapioca, cassava, or cassady on the free list; but in the same act it also provided that starch, including all preparations, from whatever

substance produced, fit for use as starch, should pay a duty of two cents per pound. Under the tariff act of July 30, 1846, starch and tapioca were made dutiable at 20 per cent. ad valorem. 9 Stat. 47. The act of March 2, 1861, continued the duty on starch at 20 per cent. ad valorem, but lowered the duty on tapioca to 10 per cent. ad valorem. 12 Stat. 188, 190. By the act of June 30, 1864, it was provided that starch made of potatoes should pay two mills a pound duty, starch made of corn or wheat three mills a pound, and starch made of rice or any other material one cent a pound; the duty on tapioca remaining 10 per cent. ad valorem. 13 Stat. 266. In the Revised Statutes root flour, tapioca, cassava, or cassady are upon the free list, and a duty imposed on "starch made of potatoes or corn one cent per pound and twenty per cent. ad valorem; made of rice or any other material, three cents per pound and twenty per cent. ad valorem." Rev. St. pp. 481, 488, 489. By the act of March 3, 1883, the duty on potato or corn starch was placed at two cents a pound, and on other starch at two and one-half cents a pound; and by the same act root flour, tapioca, cassava, or cassady, and arrowroot were placed on the free list. 22 Stat. 503, 517, 520, 521. The law so stood at the time of the passage of the act of 1890, in which act are the provisions already twice quoted, and which act omitted from the free list root flour, but inserted therein "arrowroot, raw or manufactured." While root flour, tapioca, cassava, or cassady remained upon the free list, with a duty imposed on the various starches at so much a pound, it was held in a number of cases by the treasury department that flour made from the mandioc root was not embraced by the provisions in respect to starch, but was entitled to free entry. Some of those decisions proceeded upon the ground that the flour was one form of tapioca, and therefore embraced by that term, and some of them upon the ground that the flour, being made from the mandioc root, was a root flour, and entitled to free entry as such. Decisions of Treasury Department, §§ 3161, 5802, 7971, 9031. And in Chung Yune v. Kelly, 14 Fed. 639, Judge Deady held that flour made from the manihot root, whether known as root flour, cassava, or tapioca, having been expressly exempted from duty by the then existing statute, was not included in the provisions imposing a duty on starches, although largely composed of starch granules, and fit for use as starch. The fitness of this root flour, included within the term "tapioca" as understood by the general trade of the United States, for use as starch in laundry work, as well as in the arts and manufactures, is clearly shown by the evidence and the findings of the court below. Indeed, it is shown that in this country, at least, it is chiefly so used. In view of the former legislation, to which reference has been made, and of the decisions that were based upon it, it does not admit of doubt, we think, that when congress, by the act of 1890, dropped root flour from the free list, and imposed a duty, not only on starches, as theretofore, but also on "all preparations, from whatever substance produced, fit for use as starch," it intended to add to the protection of American starches, and to make all root flour fit for use as starch, from whatever root produced, and under whatever generic name known, pay a duty at the prescribed rate. There is

nothing to the contrary in the case entitled Townsend v. U. S., 5 C. C. A. 489, 56 Fed. 222. The government's case there was, of course, ended by the failure to make it appear that the article in question was fit for use as starch. The learned counsel for the respondents in the present case, in a supplemental brief, refer to the action of the last congress in respect to the tariff act just enacted, known as the "Dingley Bill," as sustaining their construction of the act of 1890. It is said that the Dingley bill, as introduced in the house of representatives, provided for a duty of one-half of one cent per pound on "tapioca, cassava, or cassady, farina, and sago, in flake, pearl, or flour," and that, as enacted, the article tapioca was transferred to the free list, and no mention made of flour, flake, or pearl tapioca; while in the same bill as introduced and as enacted provision was made for a duty on starch and "preparations" fit for use as starch. To what extent, if at all, the latter act was influenced by the decision in the Townsend Case and by the various rulings made by the treasury department under the provisions of the act of 1890 known as the "McKinley Bill," and the subsequent tariff act known as the "Wilson Bill," may be proper subjects for consideration when an interpretation of the provisions of the Dingley bill is demanded. The question does not arise in the present case, the decision of which involves only the true meaning of the act of 1890. What congress meant by that act is not aided by its act in 1897. Judgment reversed, and cause remanded, with directions to the court below to enter judgment upon the findings in accordance with the prayer of the petition.