# UNITED STATES v. WM. COOPER & NEPHEWS, INC. (No. 3656)[1]

United States Court of Customs and Patents Appeals, April 25, 1934

*Charles D. Lawrence*, Assistant Attorney General (*William H. Futrell* and *Ralph Folks*, special attorneys, of counsel), for the United States.
*James R. Ryan* for appellee.

[Oral argument October 6, 1933, by Mr. Folks and Mr. Ryan]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court holding certain "derris resin or extract" free of duty under the

[1] T. D. 47038.

provisions for natural resins, not specially provided for, contained in paragraph 1686 of the Tariff Act of 1930, as claimed by the importer, rather than dutiable at 25 per centum ad valorem under the provision for all medicinal preparations contained in paragraph 5 of that act, as assessed by the collector at the port of Chicago, Ill.

The paragraphs in question read as follows:

PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

PAR. 1686. Gums and resins: Damar, kauri, copal, chicle, dragon's blood, kadaya, sandarac, tragacanth, tragasol, and other natural gums, natural gum resins, and natural resins, not specially provided for.

On the trial below, the importer called two witnesses. One, C. E. Timson, a chemist and the president of the importing company, appellee, engaged in the manufacture of insecticides; the other, Foster K. Ballard, a chemist and an examiner of merchandise in the office of the United States appraiser at the port of Chicago.

The witness Timson stated that the merchandise as imported was a very fine dark brown powder; that the only information he had as to the character of the merchandise and the method of its production was obtained from an English chemist with whom he had contact; that the involved "derris resin or extract" was obtained by means of a *secret process* from the root of the *derris ellepitia* plant found in the East Indies; that, although he was not qualified to describe the process, it was extracted from derris root by means of alcohol or other solvent; that the "solvent" was then evaporated and the residue—resin—ground into a fine powder; and that the resin was used by appellee in the manufacture of animal and plant insecticides, but chiefly in the manufacture of animal insecticides.

The witness Ballard stated that he had analyzed the involved merchandise, and found that it consisted of derris resin, obtained from derris root; that he had no information, except such as was obtained from the witness Timson, as to its use or the method of its production, but that the witness Timson told him that it was used with other ingredients in insecticides, which were used chiefly on animals.

Upon this record, the court below, in an opinion by Brown, J., held that the merchandise was a natural resin; that it was covered by the provisions for such resins contained in paragraph 1686, *supra;* "that an eo nomine provision controls over a general provision expressing use", and that, therefore, the merchandise was more specifically provided for as a natural resin under paragraph 1686, than as a medicinal preparation under paragraph 5. As authority for its holding, the court cited the case of *Chew Hing Lung* v. *Wise, Collector,* 176 U.S. 156.

In the case of *Chew Hing Lung,* v. *Wise, Collector, supra,* the Supreme Court held that the *eo nomine* provision for "tapioca", contained in paragraph 730 of the tariff act of 1890, was a more specific designation for "tapioca flour", than the general provisions, contained in paragraph 323 of that act, for "starch, including all preparations, from whatever substance produced, fit for use as starch". It is obvious from the court's opinion that its holding, so far as the question of relative specificity was concerned, was based upon the proposition that it was the purpose of the Congress in that act to except "tapioca" from the general provisions of paragraph 323. The court stated that the principle decided in the case of *Magone* v. *Heller,* 150 U.S. 70, wherein it was held that the provisions contained in the Tariff Act of 1883, exempting from duty all substances expressly used for manure, more specifically designated a "kind of sulphate of potash" than did the *eo nomine* designation "sulphate of potash", contained in that act, was not applicable to the issues there under consideration. We quote from the court's decision:

If the statute in this case had said that starch was dutiable, including all preparations from whatever substance produced, expressly intended and fit for use as starch, then tapioca flour, if fit and intended for such use, might be dutiable under the paragraph in question, and not be exempt as a form of tapioca. But when the language is, fit for use as starch, it is so much more general, that it is properly qualified by the subsequent paragraph which exempts tapioca, and consequently tapioca flour, one of its commercially known forms.

It is obvious that the question of "chief use" was not involved in that case.

The sole purpose of the courts in applying the rule of relative specificity in the construction of tariff statutes is to ascertain the congressional intent. In order to ascertain and carry out such intent, the courts have repeatedly held that an *eo nomine* designation must prevail over words of general description, unless, in a particular case, the Congress has indicated a contrary purpose. *United States* v. *Hillier's Son Co.,* 14 Ct. Cust. Appls. 216, T.D. 41706, and cases cited. The *eo nomine* rule is not controlling where it appears that the Congress intended that a designation by use should prevail. *Magone* v. *Heller, supra; Fink* v. *United States,* 170 U.S. 584; *United States* v. *Ducommun Hardware Co.,* 7 Ct. Cust. Appls. 353, T.D. 36904, and cases cited; *United States* v. *Irwin & Co.,* 7 Ct. Cust. Appls. 360, T.D. 36906; *United States* v. *Wiebusch & Hilger,* 7 Ct. Cust. Appls. 364, T.D. 36907; *United States* v. *Hillier's Son Co., supra; United States* v. *Lo Curto & Funk,* 17 C.C.P.A. (Customs) 19, T.D. 43319; *Frank P. Dow, Inc.* v. *United States,* 21 C.C.P.A. (Customs) 282, T.D. 46816. It is unnecessary to cite other cases, although there are many holding to the same effect.

The involved merchandise is not provided for by name in either paragraph 5 or paragaph 1686. Each of the competing provisions is merely descriptive of a class of articles.

Paragraph 1686 includes all natural resins, not specially provided for, regardless of the uses to which they may be put.

In order to determine whether an article—a preparation—is covered by the provision for "medicinal preparations", not specially provided for, contained in paragraph 5, the test of use must be applied. *United States* v. *Hillier's Son Co.*, *supra*. In that case it was held that scammony resin, obtained by percolating scammony root with alcohol, and then precipitating the resin with water, used solely, when combined with inert carriers, as a medicinal preparation, was more specifically provided for as a medicinal preparation under paragraph 5 of the Tariff Act of 1922, than as resins under paragraph 1584 of that act.

The involved merchandise was assessed by the collector as a medicinal preparation. The burden was upon appellee to overcome the presumption of correctness attending the collector's classification.

The evidence produced is not very satisfactory. The testimony of the witness Timson is based upon information which he said he obtained from a chemist in England, with whom he had contact. Although he was unable to describe or explain the "secret process" by which the involved merchandise was produced, he stated that it was extracted from derris root by means of alcohol or other solvent; that the solvent was then evaporated and the residue—a natural resin—ground into a fine powder; and that it was used chiefly as an ingredient in insecticides for use on animals. There is no evidence of record that the imported resin does not possess therapeutic properties. Whether the other ingredients in such insecticides were merely inert carriers, or whether they had therapeutic properties does not appear from the testimony. Accordingly, it must be presumed, in view of the collector's classification, that the involved resin possessed, and was used for its, therapeutic properties; that the other ingredients with which it was used in insecticides were merely inert carriers; that they did not possess therapeutic properties; and that it was not necessary to compound the imported resin with other ingredients having medicinal properties in order to make it useful as a medicinal preparation. *United States* v. *Hillier's Son Co.*, *supra*.

An "insecticide" is "an agent or preparation for destroying insects." Webster's New International Dictionary.

The insecticides made by appellee, of which the involved resin is an ingredient, are used chiefly on animals. They are undoubtedly used for the "prevention, cure, or alleviation of disease." See *United States* v. *Nagase et al.*, 11 Ct. Cust. Appls. 144, T.D. 38939. In any event, there is no evidence of record to overcome the presumption, raised by the collector's classification, that they are so used.

The terms "medicine", "medicinal", and "drug" are defined in Webster's New International Dictionary and Funk & Wagnalls' New Standard Dictionary, respectively, as follows:

Medicine, *n.* 1. The science and art dealing with the prevention, cure, or alleviation of disease; in a narrower sense, that part of the science and art of restoring and preserving health which is the province of the physician as distinguished from the surgeon and obstetrician. 2. Any substance or preparation used in treating disease; a medicament; a remedial agent; a remedy; physic.

Medicine, *v. t.* To give medicine to; to affect, effect, bring, or restore as a medicine does.

Medicinal, *a.* 1. Curative or alleviative; used for the cure or alleviation of bodily disorders; as, medicinal tinctures, plants, or springs. 2. Of or pertaining to medicine; medical.

Drug, *n.* 1. Any substance used as a medicine, or in the composition of medicines, for internal or external use; formerly, any stuff used in dyeing or in chemical operations. Whether or not a given substance should be included under the term drug depends upon the purpose for which it is sold (as regards the seller) or used (as regards the purchaser).

Medicine, *n.* 1. A substance possessing or reputed to possess curative or remedial properties. Medicines may be either solid or liquid, and are broadly classed as internal or external medicines, from their method of use, and simple or compound medicines, according as they contain one or many ingredients. Plants and minerals are the source of most medicines, some of which are active poisons when taken in larger doses.

Medicinal, *a.* 1. Of or pertaining to medicine; adapted to heal or mitigate bodily diseases; as *medicinal* springs.

Medicinal, *n.* Any medicine or medicinal substance.

Drug, *n.* 1. Any substance used as a medicine, or an ingredient of chemical compositions used in the arts: in colloquial use, a narcotic.

Paragraph 34 of the Tariff Act of 1930 reads as follows:

PAR. 34. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided,* That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further,* That no article containing alcohol shall be classified for duty under this paragraph.

It will be observed that that paragraph provides for natural and uncompounded and not edible drugs of vegetable or animal origin. The paragraph also provides "that the term 'drug' wherever used in this Act shall include only those substances having therapeutic or medicinal properties *and chiefly used for medicinal purposes.*" (Italics ours.)

36

The provisions of paragraph 34, limiting the operation of the paragraph to drugs having therapeutic or medicinal properties and chiefly used for medicinal purposes, was not contained in the drug paragraphs of tariff acts, prior to the Tariff Act of 1922, and was inserted in paragraph 34 of that act, according to the Summary of Tariff Information, 1921, page 91, prepared by the Tariff Commission for the information of the Committee on Finance of the Senate, because the term "drugs" in prior tariff acts had "been interpreted in different ways."

In view of the fact that the Congress has required the application of the test of chief use to the drug paragraphs of the act, we can see no reason, so far as the test of use is concerned, for not applying the same test to the provision for medicinal preparations contained in paragraph 5. See *Monticelli Bros. et al.* v. *United States*, 8 Ct. Cust. Appls. 21, T.D. 37162. Both medicinal preparations and drugs, according to the statutory meaning of those terms, have therapeutic or medicinal properties, and both must be used for the prevention, cure, or alleviation of bodily disease of either man or animal. See *United States* v. *Nagase et al., supra.*

Although there are expressions in some former opinions of the court to the effect that a medicinal preparation is a preparation exclusively used as a medicine, and in others that it is "something which is of use, or believed by the prescriber or user fairly and honestly to be of use" as a medicine, the question now before us for consideration, that is, whether the doctrine of exclusive use, chief use, or suitability for use should be applied, in order to determine whether a preparation is a medicinal preparation, was not necessary to a determination of the issues in those cases.

In the case of *Fink* v. *United States, supra,* the Circuit Court of Appeals, Second Circuit, stated in a certificate to the Supreme Court of the United States that "The commercial meaning of the term 'medicinal preparation' is the same as its ordinary meaning, viz, a substance used solely in medicine and prepared for the use of the apothecary or physician to be administered as a remedy in disease." The questions which the Circuit Court of Appeals propounded to the Supreme Court in that case related to the proper dutiable classification of muriate of cocaine. In answering those questions, the court, among other things, said:

Being a medicinal preparation, made as such and solely used as a medicine, the language of paragraph 74 clearly more definitely applies to it than does the generic provision "of chemical compounds and salts" found in paragraph 76. *Magone* v. *Heller,* 150 U.S. 70; *Robertson* v. *Salomon,* 130 U.S. 412.

It has been suggested that the Supreme Court held in that case that a medicinal preparation was one used solely as a medicine. It is evident, we think, that the Supreme Court did not so hold. It merely accepted, for the purpose of answering the questions propounded to it, that a medicinal preparation, both as commonly and commercially understood, was a "substance used solely in medicine * * *." Furthermore, it is evident, we think, from the certificate of the Circuit Court of Appeals that its definition of the term "medicinal preparation" was based upon the testimony in that case. But, however that may be, we are of opinion that the same test of use—chief use—should be applied to the provision for "medicinal preparations", contained in paragraph 5 of the Tariff Act of 1930, as the Congress has required, by the provisions of paragraph 34, shall be applied to the drug paragraphs of that act.

In view of the fact that the involved merchandise is chiefly used as a medicinal preparation, we are of opinion that it is more specifically provided for as such, under paragraph 5, than as a natural resin, under paragraph 1686.

It is contended by counsel for appellee that as the witness Ballard, the examiner of merchandise in the office of the United States appraiser at the port of Chicago, who advisorily classified the involved resin as a medicinal preparation, had no information on the subject, except such as was given him by the witness Timson, the president of the appellee company, there is no presumption of correctness attending the collector's classification.

It was the duty of the collector to classify the merchandise. "The presumption of correctness" attends his classification, not the advisory classification of the examiner. And, although the collector may not, as a matter of fact, have possessed information, other than that obtained from the examiner, we may not give such a conjecture the status of a legal presumption.

Counsel for the Government claimed in its assignment of errors, and in its brief, that the court below erred in not holding the imported merchandise dutiable as a "medicinal preparation", or "in not finding, alternatively", that it was dutiable as a drug at 10 per centum ad valorem under paragraph 34, *supra*.

With regard to the question of whether the imported resin is properly dutiable as a drug under paragraph 34, it is sufficient to say that that issue was not raised in appellee's protests, and, therefore, was not before the court below. Accordingly, we will not consider it.

For the reasons herein stated, the judgment is *reversed*.