(R.D. 11710)

AIRCO SPEER DIVISION, AIR REDUCTION COMPANY, INC.

*v.*

UNITED STATES (MATSUSHITA ELECTRIC CORP. OF AMERICA, PARTY-IN-INTEREST)

Entry Nos. 770300, etc.

(Decided June 11, 1970)

*Lincoln & Stewart* (*Eugene L. Stewart* of counsel) for the plaintiff.

*William D. Ruckelshaus,* Assistant Attorney General (*Glenn E. Harris,* trial attorney), for the defendant.

*Tanaka & Walders* (*Hajime William Tanaka* and *Lawrence R. Walders* of counsel) ; *Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Richard C. King* of counsel), associate counsel; for the party-in-interest.

FORD, Judge: This case is an appeal for reappraisement brought by an American manufacturer of merchandise of the same class or kind as that comprising the importations herein. Plaintiff has fulfilled the necessary requirements for commencing an action by an American manufacturer pursuant to section 516(a), Tariff Act of 1930, as amended. Documents indicating compliance with such requirements were placed in evidence as plaintiff's collective exhibits 1–A, 1–B, and 1–C.

The merchandise consists of fixed carbon composition resistors imported from Japan. Plaintiff contends the imported merchandise should be subject to appraisement as an article appearing on the final list of the Secretary of the Treasury, T.D. 54521. Plaintiff claims the imported merchandise falls within the description "Television apparatus, and parts thereof (except cameras), wholly or in chief value of metal." This claim would, if upheld, require the appraisement of the instant importations on the basis of the higher of foreign or export value under the provisions of section 402(a), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 70 Stat. 943, rather than on the basis of export value under the provisions of section 402(b), Tariff Act of 1930, as amended, *supra*, as was done by the appraising official.

A pretrial conference was held to clarify the issues in this case and as a result thereof this court limited the issue to whether "the involved resistors [1] are wholly or in chief value of metal and [2] are in truth and in fact parts of television apparatus."

The record in this trial consists of the testimony of eight witnesses called on behalf of the plaintiff, twenty-eight exhibits introduced into evidence on behalf of plaintiff, and six exhibits introduced on behalf of defendant.

The dual aspect of plaintiff's burden of proof lends itself to discussion in two phases. The first question relates to whether the imported resistors are in chief value of metal.

The testimony of five witnesses bears on this issue. They were Dr. Michael L. Pearce, the manager of the Chemical and Physical Measurements Group of plaintiff's research department; George F. Chadwick, plaintiff's manager of electronic component development, Clarence F. Fritz, plaintiff's director of quality control and inspection,

William A. B. Simpson, manager of the statistical section of the Phelps-Dodge Corporation, and Robert E. Baker, director of manufacturing for the plaintiff. Their testimony related to the nature and composition of the resistors in question, the process of manufacture and the value of the component materials.

Dr. Pearce testified that a research group, working under his supervision, performed two separate programs of laboratory analyses and comparisons between imported resistors and plaintiff's resistors. The first series of tests were performed on imported resistors of the manufacturer herein which were secured by plaintiff and are represented in plaintiff's collective exhibit 10–A. The second series of tests were performed on representative samples of the importations supplied by the party-in-interest during the course of the trial, and represented in plaintiff's collective exhibit 25. In both these tests, plaintiff's resistors and the imported resistors were subjected to microscopic examination, spectrographic and X-ray diffraction analysis and infrared spectrophotometry and ashing techniques. In addition, their weights and dimensions were measured.

The results of these tests were summarized in written reports received in evidence as plaintiff's exhibits 11 and 12. The basic conclusion reached is that the two groups of resistors are extremely similar in size, weight, design, construction and composition, so much so that there is no significant difference between them. The only difference of any note which was detected was that the metallic coating on the leads of plaintiff's resistors is relatively pure tin while that on the imported resistors is a lead tin alloy. In addition, the witness testified that a report of similar analyses, conducted by the United States Customs Laboratory and introduced into evidence as plaintiff's exhibit 12–A, reached conclusions substantially the same as those reached in his own researchers.

Mr. Chadwick testified primarily with regard to the process involved in the composition and manufacture of fixed carbon composition resistors. He testified that the resistance qualities of a resistor are directly related to the relative proportions of inert or nonconducting material that is mixed with carbon black in the core of the resistor. He stated that if the resistance value of a resistor is known and its component materials identified, it must of necessity follow that the relative proportions of the components can be predicted. In short, he stated that the rating of the resistor predetermines its size and composition and that the proportions and amounts of materials used in the imported resistors were closely similar to those used by plaintiff in resistors of the same resistance values.

The witness further testified that the production steps involved in producing such resistors must be substantially the same. With the aid

of a schematic drawing, placed in evidence as plaintiff's exhibit 27, the witness testified regarding the final assembly of a resistor. Before final assembly, resin is mixed with inert filler to form the material which will form the shell of the resistor. Resin is also mixed with the inert filler and a conductor, such as carbon black, to form the core material.

During the final assembly, the core mix and shell mix are brought together in a molding step and the wire leads are then incorporated into the resulting body.

The witness was not able to identify the manufacturer and qualities of certain longitudinal cross sections of resistors placed in evidence as defendant's exhibits A through F.

Mr. Fritz testified primarily with regard to whether or not the imported resistors and those of the plaintiff which they resembled were of a military grade. He stated that tests were made under his supervision of a sampling of imported resistors supplied by the party-in-interest and samples of resistors of the same resistance values supplied by plaintiff. The results of these tests, conducted under specified physical and environmental conditions are summarized in a report placed in evidence as plaintiff's exhibit 14. This report concludes that the resistors involved herein are all of a commercial grade and do not meet the requirement of the military grade that 99 percent function within a tolerance rating of plus or minus 5 percent.

Mr. Fritz also testified that the manufacturer of the imported resistors, Matsushita, was not listed as a qualified supplier of military grade resistors for use in the United States on a list issued by the Defense Electronics Supply Center, which list was placed in evidence as plaintiff's collective exhibit 28.

Mr. Simpson testified in connection with the price of electrolytic copper in Japan during the years 1954 to 1967. He relied on a publication known as the "Metal Bulletin" published in London which he characterized as the leading authority for world copper prices, and a publication known as "Metal Bulletin Handbook" which he characterized as equally authoritative. Selected pages of these publications were placed in evidence as plaintiff's collective exhibits 6–A through 6–E, and plaintiff's exhibit 7 showing respectively, the 1954 and 1967 prices of electrolytic copper in Japan. Based on his company's purchasing activities on the London Metals Exchange and his observation of the world price situation regarding electrolytic copper, the witness affirmed the correctness of the prices contained in these publications.

A letter from an organization which serves as an agent for Japanese domestic mining companies in the sale of copper was introduced in evidence as plaintiff's exhibit 8. The prices therein correspond to the average weekly prices for 1967 contained in the Metal Bulletin, *supra*.

The witness also testified that the price of electrolytic copper was

about 20 percent below that of copper wire. He affirmed the correctness of a page from the "Metal Bulletin Handbook, 1968" which states the price for copper wire in Japan in 1967. Said page was placed in evidence as plaintiff's exhibit 9.

Mr. Baker's testimony relates to the essential question of the value of the component materials of the resistors involved herein. His testimony incorporates the findings of those witnesses whose testimony has been summarized heretofore and, in addition, relies on cost analyses prepared under his supervision and a number of additional documents relating to the cost of certain component materials in Japan. For the sake of convenience, these additional documents are summarized as follows:

Plaintiff's collective exhibits 13–A through 13–E consisted of selected pages properly verified, from publications of the Research and Statistics Division, Minister's Secretariat, Ministry of Industrial Trade and Industry, Government of Japan. These publications are the "Mining Yearbook of Japan" for the years 1954 and 1967, the "Year Book of Chemical Industries Statistics 1967," the "Statistics of Chemical Industry in Japan, 1954" and the "Year Book of Non-Ferrous Metal Products Statistics, 1967."

Plaintiff's exhibits 18, 19, and 20 consist respectively of the affidavits of a management engineer in Japan, a person active in marketing and industrial research in Japan and a chemical consultant in Japan attesting to the accuracy of the same source material contained in plaintiff's collective exhibits 13–A through 13–E. In addition these exhibits each contain a summary sheet of data extracted from the source material showing the 1954 and 1967 prices for the particular component materials selected by plaintiff as necessary to its proof. In addition, plaintiff's exhibit 19 contains pages from the "Year Book of Chemical Industries Statistics, 1967."

At the time of trial, I reserved decision on the admission into evidence of plaintiff's collective exhibits 15, 16, and 17 for identification. I have decided that these exhibits, which comprise essentially the same material as plaintiff's exhibits 13–A – 13–E, under cover of affidavits from officials of the Library of Congress, the Library of the Department of Labor and a scientist employed by the Bureau of Mines, Department of Interior, should be admitted into evidence. These exhibits contain certified translations of those portions of the source material deemed relevant by plaintiff to proof of the cost of component materials.

Based on the foregoing materials, Mr. Baker attempted to reconstruct the cost of component materials, in the stage just prior to final assembly, of the imported resistors. He based his work on the premise of the essential similarity of the imported and domestic resistors as

developed in the testimony of Dr. Pearce. He first grouped the resistors into five groups or ranges of values. From plaintiff's cost records and analyses of direct labor and overhead attributable to the materials, he developed a total cost for the component materials at the stage required for the final assembly in plaintiff's own manufacturing process. Such costs for 1967 were:

*(average costs per thousand resistors)*

| | 33 to 82 Ohms | 120 to 820 Ohms | 1, 200 to 120, 000 Ohms | 150, 000 to 680, 000 Ohms | 1 to 22 Megohms |
|---|---|---|---|---|---|
| | *Group 1* | *Group 2* | *Group 3* | *Group 4* | *Group 5* |
| **MINERALS:** | | | | | |
| Silica flour, natural graphite, & asbestos float | $0. 2380 (*R. 526*) | $0. 2367 (*R. 528*) | $0. 193 (*R. 529*) | $0. 1931 (*R. 531*) | $0. 1761 (*R. 532*) |
| **CHEMICALS:** | | | | | |
| Resin | $0. 2560 (*R. 527*) | | | | |
| Phenolformaldehyde resin, polyamide resin, polyvinyl butyral, carbon black | | $0. 3171 (*R. 528*) | | | |
| Phenolformaldehyde resin, coal tar pitch, carbon black | | | $0. 2277 (*R. 529*) | $0. 2276 (*R. 531*) | |
| Phenolformaldehyde resin, coal tar pitch, polyvinyl butyral, carbon black | | | | | $0. 2350 (*R. 532*) |
| **PROCESSING SOLVENTS:** | | | | | |
| Acetone | $0. 2066 (*R. 527*) | | $0. 1797 (*R. 529, 530*) | $0. 1797 (*R. 531*) | |
| Acetone, isopropyl alcohol, toluene | | $0. 2275 (*R. 528*) | | | |
| Acetone & Benzol | | | | | $0. 1684 (*R. 532*) |
| **WIRE, CUT & FORMED** | $1. 1013 (*R. 527*) | $1. 1013 (*R. 529*) | $1. 1013 (*R. 530*) | $1. 1013 (*R. 531*) | $1. 1013 (*R. 532*) |

The witnesses' analyses of plaintiff's costs for 1954 were as follows:

(<em>average costs per thousand resistors</em>)

| | 33 to 820 Ohms | 1,200 to 6,500 Ohms | 39,000 to 120,000 Ohms | 150,000 to 680,000 Ohms | 1 to 20 Megohms |
|---|---|---|---|---|---|
| | *Group 1* | *Group 2* | *Group 3* | *Group 4* | *Group 5* |
| **MINERALS:** | | | | | |
| Silica flour, asbestos float, & natural graphite | $0. 1213 (R. 535) | | | | |
| Silica flour & asbestos float | | $0. 1186 (R. 536) | $0. 1186 (R. 537) | $0. 1186 (R. 537) | $0. 1136 (R. 538) |
| **CHEMICALS:** | | | | | |
| Phenolformaldehyde resin, carbon black | $0. 1564 (R. 535, 536) | $0. 1556 (R. 536) | | | |
| Phenolformaldehyde resin, coal tar pitch, carbon black | | | $0. 1556 (R. 537) | $0. 1560 (R. 538) | $0. 1547 (R. 538) |
| **PROCESSING SOLVENTS:** | | | | | |
| Acetone | $0. 1015 (R. 536) | $0. 1015 (R. 536) | $0. 1015 (R. 537) | $0. 1015 (R. 538) | |
| Acetone & Benzol | | | | | $0. 1009 (R. 538) |
| **WIRE, CUT & FORMED** | $0. 5416 (R. 536) | $0. 5416 (R. 536) | $0. 5416 (R. 537) | $0. 5416 (R. 538) | $0. 5416 (R. 538) |

The witness, utilizing the cost of materials contained in the exhibits summarized, *supra*, prepared cost analyses in which he substituted the cost of raw materials in Japan and retained the United States labor and overhead costs for advancing said materials to the state required just prior to final assembly. The costs thus developed for 1967 were as follows:

(*average costs per thousand resistors*) (R. 632)

| | 33 to 82 Ohms | 120 to 820 Ohms | 1, 200 to 120, 000 Ohms | 150, 000 to 680, 000 Ohms | 1. 8 to 22 Megohms |
|---|---|---|---|---|---|
| | *Group 1* | *Group 2* | *Group 3* | *Group 4* | *Group 5* |
| **MINERALS:** | | | | | |
| Silica flour, natural graphite, & asbestos float | $0. 2121 (*R.630*) | $0. 2242 (*R.632*) | $0. 1812 (*R.633*) | $0. 1812 (*R.633*) | $0. 1656 (*R.634*) |
| **CHEMICALS:** | | | | | |
| Resin | $0. 4068 (*R.630*) | | | | |
| Phenolformaldehyde resin, polyamide resin, polyvinyl butyral, carbon black | | $0.4528 (*R.632*) | | | |
| Phenolformaldehyde resin, coal tar pitch, carbon black | | | $0. 3629 (*R.633*) | $0. 3629 (*R.633*) | |
| Phenolformaldehyde resin, coal tar pitch, polyvinyl butyral, carbon black | | | | | $0. 3443 (*R.634*) |
| **PROCESSING SOLVENTS:** | | | | | |
| Acetone | $0. 2055 (*R.630*) | | $0. 1789 (*R.633*) | $0. 1789 (*R.634*) | |
| Acetone, isopropyl alcohol, toluene | | $0. 2252 (*R.633*) | | | |
| Acetone & benzol | | | | | $0. 1664 (*R.634*) |
| **WIRE, CUT & FORMED:** | (*R.630*) | (*R.633*) | (*R.633*) | (*R.634*) | (*R.634*) |
| Raw material cost | $0. 8093 | $0. 8093 | $0. 8093 | $0. 8093 | $0. 8093 |
| Processing cost (labor & overhead) | 0. 1869 | 0. 1869 | 0. 1869 | 0. 1869 | 0. 1869 |
| Total | $0. 9962 | $0. 9962 | $0. 9962 | $0. 9962 | $0. 9962 |

The costs for 1954 were as follows:

*(average costs per thousand resistors)* *(R. 636)*

| | 33 to 820 Ohms | 1, 200 to 6, 500 Ohms | 39, 000 to 120, 000 Ohms | 1 to 20 Megohms |
|---|---|---|---|---|
| | *Group 1* | *Group 2* | *Group 3* | *Group 4* |
| **MINERALS:** | | | | |
| Silica flour, asbestos float, natural graphite | $0. 1019 (*R. 636*) | | | |
| Silica flour, asbestos float | | $0. 1013 (*R. 638*) | $0. 1013 (*R. 638*) | $0. 1010 (*R. 639*) |
| **CHEMICALS:** | | | | |
| Phenolformaldehyde resin, carbon black | $0. 3050 (*R. 636*) | $0. 3043 (*R. 638*) | | |
| Phenolformaldehyde resin, coal tar pitch, carbon black | | | $0. 3046 (*R. 638*) | $0. 3108 (*R. 639*) |
| **PROCESSING SOLVENTS:** | | | | |
| Acetone | $0. 1052 (*R. 636*) | $0. 1052 (*R. 638*) | $0. 1052 (*R. 638*) | |
| Acetone & benzol | | | | $0. 1051 (*R. 639*) |
| **WIRE, CUT & FORMED:** | (*R. 636*) | (*R. 638*) | (*R. 638*) | (*R. 639*) |
| Raw material cost | $0. 3647 | $0. 3647 | $0. 3647 | $0. 3647 |
| Processing cost (labor & overhead) | 0. 1272 | 0. 1272 | 0. 1272 | 0. 1272 |
| Total | $0. 4919 | $0. 4919 | $0. 4919 | $0. 4919 |

The testimony relating to the use of the imported resistors can be summarized more briefly. Three witnesses testified on behalf of plaintiff; Bruce Carlson, president of The Sprague Electric Company, Edward W. Butler, a faculty member of the University of Santa Clara Graduate School of Business and formerly executive vice president and marketing vice president of plaintiff, and Boyd Granger, a management and marketing consultant to the electronics industry.

The testimony of these witnesses was based primarily on statistics published by the marketing services department of the Electronic Industries Association, a revised forecast of the use of resistors for the year 1967, prepared by Mr. Butler and similar projections undertaken by Mr. Granger. Mr. Butler testified that the total supply of resistors available in the United States in 1967 was 3.5 billion units. From this total, he deducted 1.4 billion as made to military specifications, arriving at a residual supply of 2.1 billion. From these, he deducted 170 million consisting of resistors which do not belong to the group of ½ watt with a tolerance of plus or minus 10 or 20 percent such as those imported. He thus arrived at a total supply including importation of 1,930 million for 1967. Of these the witness testified that 1,030 million were forecast for use on television sets. Mr. Granger arrived at a figure of 1,718 million for the supply of resistors in question and 945,986,000 as the number used in television manufacture. Mr. Granger further testified that 990 million resistors constituted the relevant available supply of resistors in 1954 and 579 million were used in television manufacture.

As previously indicated, the two issues of this case are whether the imported resistors are in chief value of metal and whether they are parts of television apparatus. With respect to the first issue, plaintiff has attempted to satisfy its burden of proof by a sequence of reasoning which proceeds from the similarity of the imported resistors to its product through a detailed analysis of the material components to a reconstruction of the value of said components just prior to final assembly. I am of the opinion after careful study of the voluminous record that plaintiff, although its effort has been nothing short of prodigious, has nevertheless fallen short of the proof required by law and established by precedent.

It is fundamental that the correct method of determining the component material of chief value in an importation is to determine the cost of the components to the manufacturer at the time they are ready to be assembled into the imported article. *United States* v. *Jovita Perez et al.*, 44 CCPA 35, C.A.D. 633 (1957). It must be noted that this value prior to assembly is not a market value but a cost which includes the elements of labor and overhead or any other cost incurred in bringing the material to the penultimate stage. *Turner & Co. et al.* v. *United*

*States*, 12 Ct. Cust. Appls. 48, T.D. 39997 (1924); *United States* v. *H. A. Caesar & Co.*, 32 CCPA 142, C.A.D. 299 (1945).

Plaintiff herein has relied heavily on the costs of certain materials set forth in the publications represented by plaintiff's collective exhibits 13–A – 13–E. These figures alone however do not establish the costs in question and do not necessarily establish the costs of the raw materials used by the manufacturer herein. However, even assuming that these were indeed the costs of materials purchased by the manufacturer, the record is devoid of any proof regarding the costs necessary to bring these materials to the penultimate stage of manufacture. Plaintiff's witness saw fit to incorporate plaintiff's own costs of labor and overhead in its reconstruction of the costs of materials of the Japanese manufacturer. This was done on the assumption that whatever error was present would favor the party-in-interest since United States costs for labor and overhead must of necessity be higher than Japanese costs. I am unwilling, in a matter as complex as that involved herein and in a case in which the proof has been marked by diligence and detail, to allow an important element of plaintiff's proof to be based on the statement "[i]t is common knowledge that labor costs are lower in Japan than they are in the United States."

It should be recalled that although the witnesses were in agreement that the process of manufacture utilized by the manufacturer herein, must, by reason of the similarity of the product, be similar to that utilized by plaintiff, they could not testify as to the precise methodology of the manufacturer. That is to say, it remains possible that in one or all of the necessary steps its techniques of manufacture are costlier. Thus I must conclude that the testimony regarding the costs of materials in Japan, although gathered in an industrious manner and presented intelligently is, in a great part, more speculative than authoritative.

Plaintiff, in its effort to prove that the imported resistors are parts of television apparatus, presses the argument that the legal criteria should be whether or not they are chiefly used in television apparatus. To this end plaintiff adduced testimony to the effect that a majority of the resistors of the type comprising the instant importation were utilized in television apparatus in the years 1954 and 1967. I am persuaded by plaintiff's proof on this point that resistors of the type involved herein were indeed chiefly used in television apparatus during the years 1954 and 1967. I cannot, however, accept this as satisfactory proof that they are "parts" of such apparatus. In my opinion, the proper test of whether an article is a part is whether it is dedicated to use as a part of another article and not whether it is chiefly used in such article.

Plaintiff argues nevertheless that the chief use test is the proper one to be applied herein on the ground the practice of the Bureau of Customs at the time of the establishment of the final list was to use the chief use test in the classification of electronic components. Plaintiff contends that legal precedent sanctions the use of the chief use test in situations where long standing classification practices were in effect at the time the final list was promulgated.

A leading case on interpreting the meaning of a parts provision in the final list is *National Carloading Corporation* v. *United States*, 53 CCPA 57, C.A.D. 877 (1966), in which plaintiff contended that judicial decisions holding identical spark plugs to be parts of internal combustion engines precluded the appraiser from including them in the final list category of "automobile parts." The Court of Customs and Patent Appeals agreed that the terms of the final list must be interpreted "in the light of a long line of judicial pronouncements on the classification of parts previously handed down by the courts."

In keeping with this statement, I find that a long line of judicial pronouncements supports the view that the test of whether an article is a part is the "dedication" test. *United States* v. *American Bead Co. et al.*, 9 Ct. Cust. Appls. 27, T.D. 37873 (1918) ; *Lodge Spark Plug Co., Inc., et al.* v. *United States*, 44 Cust. Ct. 448, Abstract 64136 (1960) ; *United States* v. *Ford Motor Company*, 51 CCPA 22, C.A.D. 831 (1963) ; *John H. Faunce, Phila., Inc.* v. *United States*, 58 Cust. Ct. 32, C.D. 2874 (1967).

Plaintiff cites a number of cases in support of its contention that chief use should be the criteria used herein. However, even those cases which profess to be using a standard or chief use are, many times, applying a more stringent or different standard. Plaintiff has at best shown that the resistors in question are used in television apparatus in a majority of instances. There is language in *Magone* v. *Heller*, 150 U.S. 70 (1893), referred to in *Magone* v. *Wiederer*, 159 U.S. 555 (1895), a case cited by plaintiff, which suggests that the standard of chief use had not been met if the article in question was commonly, practically and profitably used for a different purpose even if in the majority of instances it was used for the single purpose claimed as its chief use. In other words, the authority cited by plaintiff does not support the view that a majority use is *ipso facto* chief use.

Similarly in the case of *Harold J. Cohen, East Coast Radio & Television Co., Inc.* v. *United States*, 42 Cust. Ct. 72, C.D. 2067 (1959), cited by plaintiff as an application of the chief use test to condensers held to be parts of radios, the use actually proven was an almost total use, equivalent to dedication.

In general, the relevant decisions regarding parts have scrupulously applied the "dedication" test. See *Boll, et al.* v. *United States*, 55

CCPA 86, C.A.D. 937 (1968) ; *John H. Faunce, Phila., Inc.* v. *United States, supra.*

I note in passing that the adoption of a chief use test in General Interpretative Rule 10(ij) of the new tariff schedules has no bearing on the issue herein. That rule became effective in 1963 for use in interpretation of the tariff schedules and does not shed light on the meaning of terms in the 1958 final list.

In light of the foregoing, I conclude that plaintiff has failed to establish that the involved resistors are in chief value of metal and are parts of television apparatus. The importations are therefore not subject to appraisement as articles appearing on the final list of the Secretary of the Treasury, T.D. 54521.

In view of the foregoing I find as matters of fact:

1. Plaintiff has fulfilled the requirements necessary to prosecute an action of this nature.

2. The imported merchandise at issue consists of fixed carbon composition resistors imported from Japan after the date of plaintiff's complaint, April 24, 1967.

3. Said merchandise was appraised on the basis of export value under section 402(b), Tariff Act of 1930, as amended, *supra.*

4. Plaintiff has failed to prove that said merchandise is in chief value of metal.

5. Plaintiff has failed to prove that said merchandise is described by the listing "Television apparatus, and parts thereof * * *."

6. Plaintiff has failed to prove that said merchandise is described on the final list, T.D. 54521.

I therefore conclude as matters of law:

1. Export value as that value is defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 70 Stat. 943, is the proper basis of value for the merchandise covered by the appeals herein.

2. Said value is the appraised value.

Judgment will be entered accordingly.