**AMERSHAM CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 80–5–00743.**

United States Court of International Trade.

Feb. 10, 1983.

Barnes, Richardson & Colburn, Chicago, Ill. (Robert E. Burke, Chicago, Ill., at the trial and on the briefs; Lynn S. Baker, Chicago, Ill., on the briefs), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, New York City, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch (Susan Handler-Menahem, Teaneck, N.J., at the trial and on the brief), for defendant.

RE, Chief Judge:

The question presented in this case pertains to the proper classification, for customs duty purposes, of certain merchandise described on the invoices as "Americium-241 Alpha Foil."

The merchandise was classified by the customs officials, under item 709.66 of the Tariff Schedules of the United States, as parts of apparatus based on the use of radiations from radioactive substances, and was consequently assessed with duty at the rate of 6 per centum ad valorem.

Plaintiff contests the classification and, hence, the rate of duty assessment. It is plaintiff's primary claim that the merchandise should have been properly classified under item 494.50, TSUS, which provides for chemical compounds, whether or not described elsewhere in schedule 4, which are usefully radioactive. If the imported merchandise is classifiable under item 494.50, it is entitled to be admitted free of duty.

In the alternative, plaintiff contends that, if its primary claim is not sustained, the merchandise is properly classifiable, under item 685.70, TSUS, as parts of fire alarms and other sound or visual signalling apparatus, dutiable at the rate of 4 per centum ad valorem.

Based upon a thorough consideration of the competing tariff provisions, it is the determination of the court that the imported alpha foil disks are properly classifiable under the provisions of item 685.70, TSUS, as parts of "fire alarms, and other sound or visual signalling apparatus," dutiable at the rate of 4 per centum ad valorem.

The following are the pertinent provisions of the tariff schedules:

Classified by customs officials under:

Schedule 7, Part 2, Subpart B

Apparatus based on the use of X-rays or of the radiations from radioactive substances, whether for medical, industrial, or other uses, and parts thereof:

\* \* \* \* \* \* \*

709.66 Apparatus based on the use of radiations from radioactive substances, and parts thereof . . . . . . . 6% ad val.

Claimed by plaintiff under:

Schedule 4, Part 13, Subpart B

494.50 Chemical elements, isotopes, and compounds, all the foregoing (except natural thorium and uranium in a metallic state, and except compounds of natural thorium and

Claimed by plaintiff under:

> uranium), whether or not described elsewhere in this schedule, which are usefully radioactive --- Free

Alternatively claimed by plaintiff under:

> Schedule 6, Part 5

685.70 Bells, sirens, indicator panels, burglar and fire alarms, and other sound or visual signalling apparatus, all the foregoing which are electrical, and parts thereof ---- 4% ad val.

General Headnotes and Rules of Interpretation

> 10. General Interpretative Rules. For the purposes of these schedules --
>
> \* \* \* \* \* \* \*
>
> (c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it \* \* \*
>
> \* \* \* \* \* \* \*
>
> (ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

Plaintiff's principal contention is that the imported merchandise "fits within the parameters" of the definition of the term "compounds," as found in schedule 4, headnote 2(a) of the tariff schedules, and is specifically described in item 494.50, TSUS, as a usefully radioactive chemical compound.

Plaintiff also contends that, although intended for use as a part, the imported merchandise is not intended to be used as part of an apparatus based on the use of radiations from radioactive substances and, therefore, does not fall within the intended scope of the provisions of item 709.66. Hence, it claims that item 494.50 covering "compounds" specifically describes the imported merchandise and must prevail over the "parts" classification provision of item 709.66, by virtue of General Interpretative Rule 10(ij) of the tariff schedules which states that "a provision for 'parts' \* \* \* does not prevail over a specific provision for such part."

Defendant maintains that the imported merchandise was properly classified, and that the merchandise does not fall within the statutory language of· the term "compound," since in its imported condition, it is more than a "compound." It is defendant's contention that it is a new and distinct article of commerce being sold to manufacturers of apparatus based on the use of radiation.

■ Plaintiff has the burden of overcoming the statutory presumption of correctness which attaches to the classification of the customs officials. *See* 28 U.S.C. § 2639(a)(1).

■ It is also basic in customs jurisprudence that classification of imported merchandise is determined by its condition as imported. *Mitsubishi International Corp. v. United States,* 78 Cust.Ct. 4, C.D. 4686 (1977).

Plaintiff submits that the uncontroverted testimony of its witnesses, judicial precedent, legislative history, and the administrative practice of Customs, clearly establish that the imported merchandise is a chemical compound which is usefully radioactive and embraced by the statutory language in item 494.50, TSUS.

The parties are in agreement that the imported merchandise is "usefully radioactive." Thus, the initial question presented is whether plaintiff has borne its burden of proving that the imported merchandise is a "compound," as provided in item 494.50, and as defined in schedule 4, headnote 2(a) of the tariff schedules, precluding its classification under item 709.66, TSUS.

> Schedule 4, headnote 2(a) states that:
> 2. (a) The term "*compounds*", as used in this schedule, means substances occurring naturally or produced artificially by the reaction of two or more ingredients, each compound—
>> (i) consisting of two or more elements,
>> (ii) having its own characteristic properties different from those of its elements and from those of other compounds, and
>> (iii) always consisting of the same elements united in the same proportions by weight with the same internal arrangement.
>
> The presence of impurities which occur naturally or as an incident to production

does not in itself affect the classification of a product as a compound.

Plaintiff's first witness was Dr. Edgar Lorch, who holds a masters degree in reactor physics and a Ph.D. in neutron physics from the University of Birmingham in the United Kingdom. Dr. Lorch, director of marketing sales, radiation sources department of Amersham Corporation, plaintiff, was responsible for the sale of this product in the United States since 1980. He testified that he was also familiar with the imported merchandise, having been assistant manager of the production department of Amersham International in the United Kingdom, the manufacturer, for a period of ten years.

Dr. Lorch stated that americium is an element, and that americium 241 is an isotope of that element. When americium 241 is combined with oxygen it forms a compound, americium oxide. Americium oxide is a highly radioactive material, and if ingested or inhaled would cause severe medical problems. He explained that in order to protect the environment from its radioactivity, while allowing the radiation to escape, americium oxide must be encapsulated. It would not be allowed in this country for the purposes licensed by plaintiff's customers without encapsulation. He stated that a common means for encapsulating americium oxide is with alpha foil.

Dr. Lorch further testified that the encapsulation process consists of combining americium oxide with a gold powder loaded into a silver container, on the top of which would be placed a thin, gold window. He stated that "[t]his would be hot forged to forge the window on to the silver backing," and "then be powder rolled many thousands of times." He also testified that the gold window and silver backing effectively envelope and encapsulate the americium oxide. The alpha foil at that point is the capsule around the isotope.

Significantly, however, when asked on cross-examination whether it is "accurate to state that the foil is a compound," Dr. Lorch replied, "Well—do you mean in a chemical sense? It is a compound, but not in a chemical sense of the chemical definition of a compound—it is not."

Plaintiff's witness, Dr. John L. Kuranz, a scientific consultant, testified that in his opinion americium oxide is a "compound." However, when asked whether alpha foil is a "compound," he replied, "I wouldn't speculate. It is a metallurgical process and I am not acquainted with the manufacture." When asked by the court if he was able to answer that question, he replied that he could not. Plaintiff's exhibit 4, its "Product Specification," describes that metallurgical process as follows:

"The manufacturing process begins with the production of a small billet consisting of an intimate mixture of americium oxide and pure gold. The billet is first sintered and then hot forged in a silver case with a gold-palladium alloy face. Repeated rolling of this composite, under carefully controlled conditions, produces a continuously welded metal strip of the required dimensions with the active layer confined between inactive borders protected by a thin gold alloy face."

Defendant's witness, Mr. Glenn Peoples, senior inorganic analytical chemist with the United States Customs Service Laboratory in Chicago, testified that he was familiar with the term "compound," as defined in schedule 4, headnote 2(a) of the tariff schedules. He stated that while americium oxide comports with that definition, the foil does not. When asked in what way it does not, he replied:

"You change the physical state of that product and the weight ratio is not the same between silver and gold and americium and oxygen. There is no chemical bond between the americium oxide, between the gold and gold-palladium alloy, between the silver."

The record has established, therefore, that while americium oxide may be a "compound," the alpha foil is a new article, a welded strip, the product of a manufacturing or metallurgical process utilizing the ingredients of americium oxide, gold, silver and gold-palladium.

Plaintiff has stressed that the compound, americium oxide, would be unsuitable for commercial use without encapsulation, and that the reasons for its encapsulation are public health and safety in handling and storage. It also submits that the Nuclear Regulatory Commission's regulations for products containing radioactive material prohibit sale of the imported merchandise without some form of encapsulation. The testimony of record, however, reveals that americium oxide, when imported to this country in its raw state, is used in its unencapsulated form, and that unencapsulated americium 241 is sold to licensed manufacturers.

 The reasons for encapsulation of americium oxide are entirely immaterial to the determination of whether the alpha foil is a "compound," as that term is used in item 494.50 of the tariff schedules. The statutory language of the definition of "compound" does not speak of encapsulation. Moreover, the requirements of the Nuclear Regulatory Commission for encapsulation have little relevance on the interpretation of the tariff schedules. It is well established that statutes, regulations and administrative interpretations relating to "other than tariff purposes" are not determinative of customs classification disputes. Rules and regulations governing storage, handling, and use of radioactive materials were developed to protect the public safety, not as guidance to customs classification. *Pharmacia Laboratories, Inc. v. United States,* 67 CCPA 5, C.A.D. 1235, 609 F.2d 491 (1979); *United States v. Mercantile Distribuidora,* 43 CCPA 111, C.A.D. 617 (1956).

Plaintiff has also attempted to support its contention that the imported alpha foil is a "usefully radioactive compound" by reference to "an admission by customs in a circulated ruling classifying at least one analogous product under item 494.50." Plaintiff's exhibit 7, a copy of Customs ORR Ruling 200–69, published by the Customs Information Exchange, pertained to an encapsulated radium-beryllium neutron source which was stored in a capsule made from a piece of solid metal rod. In view of the composition of the product, Customs ruled that since the radium sulfate may be considered the usefully radioactive compound for which the beryllium serves as a diluent, the merchandise was classifiable under item 494.50, TSUS.

Based on the testimony of Doctors Lorch and Kuranz, that the same principles of encapsulation are involved in the radium beryllium source and in the merchandise in issue, plaintiff submits that the "metal capsule in the radium beryllium source is analogous to the gold-palladium and silver sandwich used to encapsulate the americium oxide in the subject merchandise." The court is neither persuaded nor bound by the ruling cited by plaintiff. *See Ditbro Pearl Co. v. United States,* 62 CCPA 95, C.A.D. 1152, 515 F.2d 1157 (1975); *C.J. Tower & Sons v. United States,* 33 Cust.Ct. 14, C.D. 1628 (1954). In the present case, the customs officials have decided that the alpha foil under consideration does not fall within the term "usefully radioactive compound" in item 494.50. This determination is presumed by statute to be correct. While the definition of "compound" may embrace americium oxide, the record is devoid of any testimonial evidence that it includes the imported alpha foil.

Plaintiff contends nevertheless that judicial interpretation of the predecessor provisions of item 494.50, and its legislative history, evince a congressional intent to construe broadly the articles eligible for classification under item 494.50.

The first case which dealt with a statutory provision providing for free entry of radioactive elements was *Stegemann v. United States,* 26 Treas.Dec. 16, T.D. 34052 (1914). In that case, the Board of General Appraisers, held that "Radiogen-Trinkwasser," consisting of radioactive water and bandages impregnated with a radioactive solution, and used for medical purposes, was embraced in paragraph 659, Tariff Act of 1909, as "radium." The Board observed that:

"When the Congress inserted in the Act of 1909 the provisions of the free list, using simply the word 'radium', it must

have meant to include more than the pure metal. According to the testimony in this case, radium does not occur in nature as the uncombined metal, and is not marketed for use as a medicine in that form, but only in the form of its various salts, either dissolved in water, as in this case, or mixed with some solid container. To hold in these circumstances that Congress meant only to admit free the pure metal radium, uncombined, would, in our opinion, render the provision in the free list meaningless." 26 Treas.Dec. at 16–17.

Thereafter, Congress substituted the *eo nomine* designation of "radium" in paragraph 659 of the Tariff Act of 1909 with language that extended the scope of the original provision for radium. Congress approved the interpretation announced in *Stegemann* by its enactment of paragraph 1749 of the Tariff Act of 1930, providing for free entry of "radium, and salts of, and radioactive substitutes." A leading case on the interpretation of that statutory provision is *Firestone Tire & Rubber Co. v. United States,* 10 Cust.Ct. 227, C.D. 759 (1943).

In *Firestone,* the imported merchandise, "radioactive lead oxide," was classified by the government under paragraph 46, Tariff Act of 1930, as a lead compound, not specially provided for. Plaintiff's principal claim was that the merchandise was entitled to free entry as "radium, and salts of, and radioactive substitutes," under the provisions of paragraph 1749, Tariff Act of 1930. The imported merchandise entered this country in the form of an oxide. In its imported condition it represented the only known commercial form of radium D. The record established that the imported merchandise was a residue from Alaskan ore, processed at the refinery of the Canadian exporter where uranium, silver and radium-barium are recovered. To facilitate its transportation, the solids were precipitated from the liquid and shipment was made in 50-pound cloth bags, packed in wooden boxes.

In holding that the radium D in question was entitled to free entry under paragraph 1749 of the Tariff Act of 1930, as claimed, this court noted:

"That Congress intended to give to industry and science the benefits derived from the use of such a rare substance, seems to be a fair conclusion. To effectuate such intention requires a liberal construction of the language of paragraph 1749, *supra,* sufficiently broad in scope to include the radium D in question, whose radioactive qualities give to it the prominence applicable to radium itself." 10 Cust.Ct. at 231.

Congress, having in mind what had transpired since 1930, intended to clarify the scope of the provisions of paragraph 1749 of the Tariff Act of 1930, and enacted the present provision, item 494.50 of the tariff schedules, which provides for free entry of "chemical elements, isotopes, and compounds, * * * which are usefully radioactive." *Tariff Classification Study,* November 15, 1960, Schedule 4, Part 13, pages 189, 192. This court has had occasion to interpret and apply the tariff definition of the term "usefully radioactive compound" in item 494.50 in the case of *Pharmacia Laboratories, Inc. v. United States,* 82 Cust.Ct. 166, C.D. 4798, 470 F.Supp. 853 (1979), *aff'd,* 67 CCPA 5, C.A.D. 1235, 609 F.2d 491 (1979).

In *Pharmacia* the imported merchandise consisted of certain radioimmunoassay diagnostic test kits which were classified as other articles, not provided for elsewhere in the tariff schedules, under item 799.00, TSUS. The plaintiff contended that the merchandise was properly classifiable under item 494.50, TSUS, as a usefully radioactive compound. The kits, used to detect certain chemicals in blood serum, consisted of four or five separate vials, only one containing a radioactive substance, and the others containing ingredients needed to conduct the test.

The parties agreed that the kits were entireties for purposes of customs classification. The question presented was whether the imported kits were classifiable as "usefully radioactive compounds" in item 494.50. Judge Watson held classification proper un-

der item 799.00, TSUS, on any of three grounds: (1) the individual kit is not a chemical compound in its physical form, within the meaning of the term "compound" in headnote 2(a) of schedule 4, and thus does not come within the plain meaning of the claimed provision; (2) each kit consists of a number of vials containing separate and distinct compounds, and is thus too diverse to be properly described by the claimed provision; and (3) since the nonradioactive compounds are as important to the results of the test as the radioactive compound, the latter alone should not determine classification of the kit.

The Court of Customs and Patent Appeals, in affirming the decision of this court that the imported kit did not meet the definition of "compound" found in schedule 4, headnote 2(a), stated that "[i]t is not a substance occurring naturally or produced artificially by the reaction of two or more ingredients." It stated that "[h]ence, classification of the imported kits under item 494.50 would be improper, whether they be viewed as more than 'usefully radioactive compounds' or as failing to meet the definition of 'compound.'" 67 CCPA at 7.

The rationale of this court, in denying the classification of the imported kits as usefully radioactive compounds under the provisions of item 494.50, is applicable here and supports defendant's contention.

■■■ Legislative history and the judicial interpretation of the statutory language indicate that, after the initial inclusion of the substance "radium" in the provisions of the free list in the Act of 1909, Congress intended to give to industry and science the benefits derived from the use of such a rare and radioactive substance. Congress broadened the scope of the original *eo nomine* provision for radium to include its allied elements, and thereafter extended the scope of the free-entry provision for pure radioactive elements to include chemical elements, isotopes and compounds which are usefully radioactive. Nevertheless, it is apparent that Congress did not intend to extend the duty-free entry status to articles other than, or more than, the radioactive substances, their isotopes, and compounds which are usefully radioactive. It is equally clear that there is no indication in the legislative history of the tariff schedules, or item 494.50, that Congress intended to extend the scope of duty-free entry to encompass a chemical element, isotope, or compound which has been manufactured into a new and distinct article, i.e., alpha foil.

The *Stegemann* and *Firestone* cases are readily distinguishable from the present case. In *Stegemann,* the court held the radium salts to be within the ambit of paragraph 659 of the Tariff Act of 1909 because radium does not occur in nature as an uncombined metal, and was marketed for use only in that form as a salt. In *Firestone,* the radium D, in its imported condition, was in the form of a radioactive oxide, and therefore was held by the court to be entitled to free entry under paragraph 1749, Tariff Act of 1930. Here, the imported alpha foil, in its imported condition, is not a natural element, or an oxide, but a new and distinct article produced by a metallurgical process from the ingredients of americium oxide, gold, silver and gold-palladium.

The record establishes that there is no chemical reaction among the ingredients in the manufacture of the imported alpha foil. The distinct characteristics of americium oxide, gold, silver and gold-palladium remain during and after the completion of the metallurgical process. Dr. Lorch testified that the result of the metallurgical process is a product of discreet layers of gold, silver and an active matrix. As stated in *Strohmeyer & Arpe Co. v. United States,* 2 Ct. Cust.Appls. 285, 287, T.D. 32035 (1911): "[A] chemical compound necessarily implies not a mere mingling of components but a chemical combination of them, resulting in their destruction as distinct entities and in the development by chemical reaction of a new substance possessing properties radically different from those of its constituent elements." Moreover, in the present case there is no evidence that the elements of americium oxide, gold, silver and gold-palladium are chemically bonded in the same

proportions by weight with the same internal arrangement, as required by the provisions of headnote 2(a) of schedule 4 of the tariff schedules.

■ For the foregoing reasons, it is the determination of the court that the imported alpha foil is not a "compound," as that term is used in item 494.50, TSUS, and as defined in schedule 4, headnote 2(a) of the tariff schedules.

In view of this conclusion, it is unnecessary to discuss plaintiff's contention that item 494.50 specifically describes the imported merchandise and, therefore, by virtue of General Interpretative Rule 10(ij), must prevail over the parts classification provision in item 709.66.

The parties dispute the true character or condition of the merchandise at the time of importation. Plaintiff contends that, although commercial invoice No. 791017512 sets forth the description of the alpha foil in lengths, this description is incorrect. Plaintiff states that the imported merchandise was in the form of *disks* of alpha foil. It stresses that this fact is made clear by the testimony of Dr. Lorch who testified that:

(1) the commercial invoice description referring to fifteen meters of AMMQ4015 americium 241 alpha foil was the original length in meters from which disks of foil 2.4 millimeters in diameter were stamped;

(2) they were stamped after the alpha foil was rolled and before shipment to the United States; and

(3) plaintiff always imported the alpha foil as disks, or small pieces of foil blanked from the meter lengths.

Dr. Lorch stated that the commercial invoice, part of the official documents received in evidence, contains a unique code description which refers to a single product. During the trial, this code was correlated with the list of customers which showed "the end user" of that product.

In the present case, the specific commercial invoice code represented an americium 241 alpha foil disk which was sold exclusively to BRK Electronics, a smoke detector manufacturer in the United States. Dr. Lorch stated that the commercial invoice sets forth a foil description in lengths because, although the disks are stamped out prior to shipment to the United States, Amersham International in the United Kingdom establishes its price on the value of the meter lengths. He explained that the plaintiff had no facilities for cutting disks from the foil lengths once they were in the United States. He also identified plaintiff's exhibit 3, an alpha foil disk, as a representative sample of the imported merchandise, in the condition in which it was imported.

The defendant argues that the description of the foil on the invoice papers constitutes an admission against plaintiff since it was made by a related corporation with whom it is in privity. Defendant also asserts that the invoice description of the merchandise is supported by exhibit B, a legal determination issued by the Customs Service. This determination, concerning the proper classification of the imported alpha foil, consists of internal advice between members of the Customs Service. The imported merchandise is therein described as follows:

"This foil can be formed or cut into various shapes to suit a variety of applications and is normally supplied in lengths of 100 centimeters."

The defendant submits that, although this document consists of internal advice, it contains the contentions of the attorneys for the exporter. Defendant further asserts that the law is clear that statements made in the official papers accompanying an entry will not be disregarded unless disproven by clear and convincing proof. *Globemaster Midwest Inc. v. United States,* 67 Cust.Ct. 539, 545, R.D. 11758, 337 F.Supp. 465 (1971).

■ While statements in invoices may be admissions against interest, they are merely *prima facie* against any contradictory claim made by plaintiff. They neither estop nor preclude the parties from showing the true character of the merchandise. *United States v. Puttmann,* 21 CCPA 135,

T.D. 46466 (1933); *United States v. Wo Kee & Co.,* 21 CCPA 341, T.D. 46880 (1934). A name given to merchandise on the invoice does not finally fix the status, nature, or character of an importation. *Mundo Corp. v. United States,* 56 Cust.Ct. 303, C.D. 2640 (1966).

In view of his association with the manufacturer of the imported merchandise at the time of importation, and his responsibility for sales of the merchandise in the United States since 1980, Dr. Lorch's testimony on its character or condition at the time of importation, is authoritative, competent and credible. The record also establishes his familiarity with the imported merchandise as custodian of all plaintiff's sales documents, including those during the period of importation. Predicated upon his uncontradictory testimony, the court finds that plaintiff has affirmatively established that, in the condition as imported, the merchandise was americium 241 alpha foil in disk form, 2.4 millimeters in diameter, as represented by exhibit 3.

Having determined that the imported merchandise is not a "compound" within the meaning of item 494.50, the court must turn to plaintiff's alternative claim that it is properly classifiable under item 685.70, as parts of fire alarms and other sound or visual signalling apparatus.

In support of this contention, plaintiff maintains that the testimony of record establishes that the alpha foil disks, in their imported condition, are sold throughout the United States, and are primarily designed and almost exclusively used by its customers, as parts of smoke detectors. Plaintiff submits that the basic function of a smoke detector is to serve as an early warning device, by the emission of a loud, audible alarm, to alert persons to emergency or temporary conditions. Plaintiff cites *Oxford International Corp. v. United States,* 75 Cust.Ct. 58, C.D. 4608 (1975), in support of its contention that a smoke detector falls within the purview of item 685.70, as a fire alarm or other sound or visual signalling apparatus.

Defendant maintains the record establishes that although americium foil is used in smoke detectors, it is used as a part of a source holder which is a part of a smoke detector. It cites holdings of this court for the proposition that where a particular part of an article is provided for specially, a part of that particular part is more specifically provided for as a part of the part than as a part of the whole. *Foster Wheeler Corp. v. United States,* 61 Cust.Ct. 166, 176, C.D. 3556, 290 F.Supp. 375 (1968); *Liebert v. United States,* 60 Cust.Ct. 677, 686, C.D. 3499, 287 F.Supp. 1008 (1968). Hence, it urges that since the alpha foil disks are used as parts of source holders, they should be classified as parts of apparatus based on the use of radiations under item 709.66, the provision which specifically describes the source holders, and not as parts of "fire alarms, and other sound or visual signalling apparatus." Plaintiff states that "the fact that the imported merchandise is fitted into a holder does not remove it from this alternate classification under TSUS item 685.70."

The question presented is whether smoke detectors are embraced in item 685.70, as parts of "fire alarms, and other sound or visual signalling apparatus," or are included under item 709.66 as parts of apparatus based on the use of radiations. The record demonstrates overwhelmingly that the imported merchandise is chiefly used as a part of a smoke detector. Plaintiff's witness, Mr. James W. Cook, Amersham's key accounts manager, who was responsible for marketing the imported merchandise in the United States, testified that over 95% of its customers who purchase the imported americium alpha foil disks use them in the manufacture of smoke detectors; that plaintiff sold the alpha foil disks exclusively for smoke detectors; and that the entire market, including its competitors, sold the imported alpha foil disks for use in the manufacture of smoke detectors. Mr. Lawrence Keating, vice president of marketing for Nuclear Radiation Development Corporation, a manufacturer of sealed sources and a competitor of plaintiff, testified that more

than 97% of americium foil disks are sold for smoke detector use.

In interpreting the phrase, "other sound or visual signalling apparatus" in item 685.-70, this court, in *Oxford International, supra,* stated:

"In item 685.70, the general phrase 'other sound or visual signalling apparatus' is preceded by the following enumeration: 'Bells, sirens, indicator panels, burglar and fire alarms.' All of the named devices are activated or function in temporary or abnormal situations only. Thus, the general provision 'other sound or visual signalling apparatus' must exclude articles which operate continuously, and which do not warn of the existence of emergencies or special circumstances." 75 Cust.Ct. at 68.

Smoke detectors satisfy the requirements set forth in *Oxford International.* They are devices that do not operate continuously, but only in a temporary or abnormal situation, and warn of the existence of emergencies or special circumstances. As early warning fire devices which emit a loud noise when activated, it is manifestly clear that they fall within the ambit of item 685.70, as sound signalling apparatus. It is to be noted moreover that item 685.70 specifies the term "fire alarms" along with "other sound or visual signalling apparatus," and that a statistical subdivision of item 685.70 specifically provides for "smoke detectors."

■ As to defendant's contention that the disks should be classified under item 709.66 as the provision which specifically describes the source holders, it is clear that merchandise is only classifiable as a part of a part when the second part is specifically provided for under the tariff schedules. In the *Liebert* case, the imported merchandise, which consisted of parts of clutches, which were parts of winches designed for use with tractors, were held properly dutiable as parts of clutches rather than as parts of winches because the clutches were provided for under a specific provision, to wit, item 680.54. In the present case, the source holder is not specifically provided for. Con-

sequently, it cannot be said that the alpha foil, even assuming it to be part of the source holder at importation, is more specifically provided for as a part of a second part is provided for specially under the tariff schedules. Defendant's contention that americium foil, when used in a smoke detector, is more specifically described under item 709.66 as a part of an apparatus based on the use of radiations is, therefore, not persuasive.

In *Gallagher & Ascher Co. v. United States,* 52 CCPA 11, C.A.D. 849 (1964), wherein the Court of Customs and Patent Appeals held that auxiliary heaters for use in Volkswagen automobiles were dutiable as parts of automobiles, it was stated that:

"[W]hether a given article constitutes a part of another article depends upon the nature of the so-called part and, we might add, to some degree on the function and purpose of the so-called part in its relation to the article to which it attaches or with which it is designed to serve." 52 CCPA at 13–14.

■ The evidence of record clearly establishes that the imported alpha foil disk was designed to serve as a part of a smoke detector, is chiefly used as part of a smoke detector, and when installed into a smoke detector functions as an integral, constituent and component part, without which the smoke detector would not function. It is, therefore, the determination of the court that the imported alpha foil disks are within the provisions of item 685.70 as parts of "fire alarms, and other sound or visual signalling apparatus."

Although the plaintiff has established the correctness of its alternative claim, it must also overcome the presumption of correctness that attaches to the classification under item 709.66. In support of its contention, that the imported merchandise is not properly classifiable as parts of apparatus based on the use of radiations from radioactive substances under item 709.66, plaintiff relies on the case of *Siemens America, Inc. v. United States,* 84 Cust.Ct. 180, C.D. 4856, 496 F.Supp. 266 (1980), *rev'd on other*

grounds, 68 CCPA ——, C.A.D. 1266, 653 F.2d 471 (1981).

In *Siemens,* the imported merchandise was certain gas tube surge voltage protectors. Surge voltage protectors (SVP's) are gas discharge tubes consisting of a hermetically sealed glass insulator filled with argon in which two electrodes are spacially set apart. Some of the imported SVP's contained a minute quantity of Pm147 within the glass insulator. Pm147 (promethium) is a radioactive substance.

The SVP's were classified under the provision in item 685.90, TSUS, for "other electrical apparatus * * * for the protection of electrical circuits." Plaintiff claimed that the imported merchandise was properly dutiable under the provision in item 709.66, TSUS, for "apparatus based on the use of radiations from radioactive substances." Alternatively, plaintiff claimed that the merchandise was dutiable as other electronic tubes under item 687.60, TSUS.

Plaintiff contended that the Pm147 was the "underlying basis" upon which the apparatus was dependent, and therefore the SVP's were clearly described by the "based on" language in item 709.66.

The court found the language "based on," as contained in item 709.66, evinced congressional intent to embrace merchandise in which radiation from radioactive substances is its *sine qua non,* and that radiation was not the *sine qua non* of the SVP tubes in issue since the Pm147 was not a fundamental and essential constituent of the tubes.

In affirming this portion of *Siemens,* the Court of Customs and Patent Appeals said:

> "[W]e agree with the court below that the plain meaning of the 'based on' language of item 709.66 evinces Congressional intent to limit the provisions to goods in which the use of radiation is a fundamental and essential constituent. The use of radiation must be an indispensable requisite for the apparatus *which, however, does not mean the apparatus must be based solely on the use of radiation."* 68 CCPA at ——, 653 F.2d 471 (Emphasis added.)

Plaintiff emphasizes that the observations of the court in *Siemens,* that some SVP's are manufactured without radioactive materials and that "the inclusion of a radioactive substance in the present SVP tubes was not essential to their basic function," are analogous to the situation presented in the instant case. It argues that the record discloses that many smoke detectors utilize a nonradioactive photoelectric device based on an infrared source to perform their function in warning the occupants in a certain location of the presence of smoke or fire by emitting a loud, audible alarm; that there is no significant difference between the photoelectric type smoke detector or americium 241 type in the use or quality of sound emitted; that both types are sold now in the United States, and were sold during 1979, the year of the subject importation. Plaintiff submits, therefore, that since alpha foil is not fundamental and essential to the operation of all smoke detectors, it is not properly classifiable as a part of an apparatus based on the use of radiations from radioactive substances.

Plaintiff's reliance on this case is misplaced. *Siemens* does not support the narrow construction of item 709.66 urged by plaintiff. Rather, it appears that this case supports defendant's argument "that there is no requirement that to be classified under item 709.66, an article can only be constructed so as to be based on the use of radiation." While it may be true, as plaintiff argues, that there are some smoke detectors that utilize a photoelectric mechanism without any radiation to perform its function, that fact is immaterial to the determination of the question of whether the imported alpha foil disk is part of an apparatus based on the use of radiation.

Moreover, it is clear that the rationale of the court in *Siemens,* in rejecting classification of the imported SVP's under item 709.-66, was that the radioactive material Pm147 was not a fundamental and essential constituent of the SVP's. In the case before us, the uncontroverted testimony of the witnesses establishes that the imported alpha foil is a fundamental and essential ele-

ment in the functioning of an ionized smoke detector. The testimony of plaintiff's witnesses, Dr. Lorch and Mr. Cook, that americium 241 alpha foil is crucial, essential and indispensable to the proper functioning of an ionization type smoke detector, was corroborated by defendant's witnesses, Mr. Peoples and Mr. Keating. The record establishes beyond dispute that, in the condition it was imported, the alpha foil disk is an essential and indispensable part of an ionization smoke detector.

In view of the above, it appears that the imported alpha foil disk may also be considered as a part of an apparatus based on the use of radiations from radioactive substances within item 709.66. Thus an issue of relative specificity of the two competing provisions (items 709.66 and 685.70) is posed by virtue of General Interpretative Rule 10(c), which, so far as is pertinent, reads:

"an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it * * * "

Plaintiff contends that the item that has requirements more difficult to satisfy is the more specific provision. *F.L. Smidth & Co. v. United States,* 56 CCPA 77, 85, C.A.D. 958, 409 F.2d 1369 (1969); *Ozen Sound Devices v. United States,* 67 CCPA 67, C.A.D. 1246, 620 F.2d 880 (1980). It insists that item 685.70 is more specific and difficult to satisfy because it is narrowly drawn and has definitive criteria which must be met, whereas item 709.66 is a very general provision encompassing a wide range of nonspecific products.

Defendant submits that item 709.66 is a use provision for those apparatus based on the use of radiation and, therefore, is more specific than the *eo nomine* provision for fire alarms and sound signalling devices, since a use provision is generally more specific than an *eo nomine* provision. *Travenol Laboratories, Inc. v. United States,* 67 CCPA 71, C.A.D. 1247, 622 F.2d 1027 (1980). In *United States v. Electrolux Corp.,* 46 CCPA 143, C.A.D. 718 (1959), the Court of Customs and Patent Appeals confined the application of that rule to those cases where

the competing provisions are otherwise in balance. Addressing the issue of relative specificity, the court said:

"The next and major argument of appellant is that classification in paragraph 339 is compelled by the fact that it is a 'use' provision which *must* prevail over paragraph 353, which is said to be an *eo nomine* or a descriptive designation. This result is supposed to be required by a firmly established 'doctrine' that, under the circumstances, the use designation prevails. * * *

While it is true that this court and its predecessor on many occasions have held that a use provision *should* prevail over some other, and have used the word 'doctrine' in referring to the 'doctrine of use,' an examination of a sufficient number of cases will show that this so-called doctrine is subject to 'exceptions' whenever it comes into conflict either with a clearly expressed legislative intent or a competing provision which is obviously more specific than the 'use' provision, as applied to the merchandise at bar. *Actually the 'doctrine' appears to be a convenient rule of thumb for resolving issues where the competing provisions are otherwise in balance."* 46 CCPA at 147. (Emphasis added in part.)

The crucial question in all cases is to determine which of the competing provisions has requirements which are more difficult to satisfy and which describe the article with the greatest degree of accuracy and certainty. Thus, in *United States v. Simon Saw Steel Co.,* 51 CCPA 33, C.A.D. 834 (1964), the Court of Customs and Patent Appeals stated:

"Over the years the courts have developed a number of methods for determining the intent of Congress. The first and most obvious of these is to examine the statute itself. See *Magone v. Heller,* 150 U.S. 70 [14 S.Ct. 18, 37 L.Ed. 1001] (1893). In customs classification cases, if one of the competing provisions can be said to be more specific and definite with respect to the merchandise at bar, then the merchandise may properly be classified on

this basis alone. See *United States v. Electrolux Corporation, supra.* The rule of relative specificity is a judicial aid to the construction of a statute in order to conform with the intent of Congress. In the *Electrolux* case, *supra,* this court held that the more specific provision is the one having requirements which are more difficult to satisfy. And in *Fink v. United States,* 170 U.S. 584, 586–87, [18 S.Ct. 770, 771, 42 L.Ed. 1153] (1898), the Supreme Court effectively stated the logical basis for the rule of relative specificity when it said:

> * * * Being reached, then, in some of its aspects by some of the provisions found in both paragraphs, the question is, which, if either of the two, is so dominant in its control of the article in question as to exclude the operation thereon of the other. The rule is that this, if possible, is to be determined by ascertaining whether one of the two paragraphs is more definite in its application to the article in question than is the other. * * *

In other words, the paragraph that provides for the article with the greatest degree of accuracy and certainty is the more specific provision." 51 CCPA at 40–41.

This court has often relied on the *Summaries of Trade and Tariff Information* as an accurate indicia of congressional intent. On the provisions of item 709.66, TSUS, Schedule 7, Volume 2 (1970) of the *Summaries,* states at page 95:

> "Apparatus based on the use of radiations from radioactive substances is interchangeable in application with x-ray equipment, except in the fields of medical and dental diagnosis where it is only partially interchangeable. Such equipment includes therapy apparatus, which employs radioactive cobalt, radium or some other radioactive isotope. Cobalt 60 isotope units, first used in Canada almost two decades ago, are now frequently used in the treatment of certain types of cancer. Also included in this summary are beta and gamma ray thickness gauges (used in industry) and the equipment for analyzing the composition of metal objects."

This statement clearly demonstrates that the type of apparatus that Congress intended to be embraced by item 709.66 belongs to a class of general and varied equipment used in the medical and dental fields for diagnosis and therapy, as well as apparatus used in industry, and equipment for analyzing the composition of metal objects. On the other hand, item 685.70 provides for specifically named articles such as bells, sirens, indicator panels, burglar and fire alarms, and other electrical sound or signalling apparatus. In order to be encompassed within the provisions of item 685.70, it is incumbent that an article meet the following specific criteria: it must (1) be electrical; (2) alert persons to the presence of a potential hazard; (3) activate or function in temporary or abnormal situations only. Although embracing a variety of forms, these articles are specifically named and are essentially one type of an electrical device. This specific designation should prevail over the more general and far less specific designation of the various categories of products performing the variety of functions embraced in item 709.66.

Consequently, a comparison of the two competing provisions, compels the conclusion that item 685.70 is not only the more restrictive and difficult to satisfy, but provides for the imported alpha foil disk with a greater degree of accuracy and certainty, i.e., as a part of a smoke detector.

Accordingly, based upon a thorough examination of the record and the competing tariff provisions, it is the determination of the court that the imported alpha foil disks are properly classifiable under the provisions of item 685.70, TSUS, as parts of "fire alarms, and other sound or visual signalling apparatus," dutiable at the rate of 4 per centum ad valorem.

Judgment will be entered accordingly.