would nevertheless apply the Missouri statute of limitations.[2]

 The second reason that the "party autonomy" rule is not controlling is that, again being a conflicts rule, it is concerned only with which, from among more than one (1) interested forum, *state's* law should apply. Indeed, the choice-of-law clause in the CSPTA chooses the law of Illinois, a state. However, in actions under the LMRA and ERISA it is well-established that *federal* labor law governs. *See, e.g., Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327 (9th Cir.1975); *Clark v. Kaftco Corp.*, 510 F.2d 500 (1st Cir.1975); *Teamsters Local Union No. 688 v. Crown Cork & Seal Co., Inc.*, 488 F.2d 738 (8th Cir. 1973). In *Hoosier Cardinal Corp.*, the Supreme Court held that the statute of limitations in such actions was to be found *"as a matter of federal law"* in the most analogous forum state statute of limitations. *Hoosier Cardinal Corp.*, 383 U.S. at 705, 86 S.Ct. at 1113 (emphasis added). Thus, because this is a matter of federal law, the choice-of-law clause in the CSPTA cannot alter the choice of the otherwise "appropriate state statute of limitations."

This Court's holding, however, is a narrow one. This Court does not decide whether the parties to a collective bargaining agreement or a pension trust agreement can, as a matter of federal labor law, provide expressly for a particular period of limitations. The parties did not do so here. This Court holds only that the general choice-of-law clause herein does not result in the application of a statute of limitations other than that of the forum, Missouri.

Accordingly, contractual violations which occurred prior to January 24, 1979, are barred by the five (5) year statute of limitations. Plaintiffs' motion to compel is de-

nied and defendant's motion to strike is granted.

CARLING ELECTRIC CO. (Carlingswitch, Inc.), Plaintiff,

v.

UNITED STATES, Defendant.

Court No. 77-9-03536-S.

United States Court of
International Trade.

May 31, 1984.

---

2. The fact that Missouri conflicts principles treat statutes of limitations as procedural is not the only reason that Missouri would not treat the choice-of-law clause as making the Illinois statute of limitations applicable. In both Missouri and the Restatement the parties cannot make a choice-of-law that would alter a fundamental policy of the forum state. *Restatement, Second, Conflict of Laws* § 187(2)(b) (1971).

*See also* E. Scoles & P. Hay, *Conflict of Laws* at 637–43 (1984). Statutes of limitations represent such policies. *State ex rel. Sisters of St. Mary v. Campbell,* 511 S.W.2d 141 (Mo.Ct.App.1974); *State ex rel. and to Use of Collector of Revenue of City of St. Louis v. Robertson,* 417 S.W.2d 699 (Mo.Ct.App.1967). *See also* E. Scoles & P. Hay, *Conflict of Laws* at 58–67 (1984).

Shaw & Stedina, New York City (Charles P. Deem, New York City, at trial and on brief), for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Lit. Branch, New York City (Michael P. Maxwell, New York City, at trial and on brief), for defendant.

LANDIS, Senior Judge.

This action involves two articles of electrical merchandise imported from Mexico and entered at the Port of Brownsville, Texas in 1976.

Customs classified the imported indicator lights as electrical articles or electrical parts of articles pursuant to Item 688.40 of the Tariff Schedules of the United States (TSUS), dutiable at the rate of 5.5% ad valorem and, classified the imported alleged switches as electrical articles, or parts of electrical articles pursuant to TSUS item 685.90, dutiable at the rate of 8.5% ad valorem.

Plaintiff claims the alleged switches should be classified under TSUS item 688.-40, dutiable at the rate of 5.5% ad valorem and that the indicator lights are properly classifiable as visual signalling apparatus or parts thereof pursuant to TSUS item 685.70, dutiable at the rate of 4% ad valorem. Plaintiff argues that the alleged switches consist of sub-assemblies of switches and visual signalling apparatus, each of which components perform separate, co-equal functions, neither being subordinate to the other and, that the separate indicator light and the indicator light portions of the alleged switches function to provide visual signals within the context of TSUS item 685.70.

The pertinent statutes are as follows:
Indicator Lights:

Classified:

688.40 Electrical articles, and electrical parts of articles, not specially provided for ......................5.5% ad val.

Claimed:

685.70 Bells, sirens, indicator panels, burglar and fire alarms, and other sound or visual signalling apparatus, all the foregoing which are electrical, and parts thereof .... 4% ad val.

Switch/Light
  Assemblies:

Classified:

685.90 Electrical switches, relays, fuses, lightning arrestors, plugs, receptacles, lamp sockets, terminals, terminal strips, junction boxes, and other electrical apparatus for making or breaking electrical circuits, for the protection of electrical circuits, or for making connections to or in electrical circuits; switchboards (except telephone switch-

boards) and control panels; all the foregoing and parts thereof ....8.5% ad val.

Claimed:

688.40  See above .....................5.5% ad val.

During the course of the trial plaintiff called two witnesses to testify and introduced twenty nine exhibits including two collective exhibits. Defendant did not call a witness but did introduce one exhibit. At the outset it should be noted that some exhibits are not discussed consecutively as later exhibit numbers are employed to illustrate uses of earlier exhibits.

Plaintiff's first witness was Mr. Frederick Kundahl who at the time of trial stated he was vice president of Sorenson Lighted Controls (SoLiCo) and its former sales manager for ten years. He testified that he is totally familiar with the nature and the actual potential uses of indicator lights manufactured by SoLiCo. Whereupon, plaintiff identified Exhibits 1 to 13 as representative samples of the invoices indicator lights which were subsequently admitted into evidence. Mr. Kundahl stated that the indicator light in Exhibit 1 has many uses including the signalling of functioning of aircraft landing gear, oil pressure in lawn tractors and boats, and the status of a tractor blade, whether raised or lowered. The witness testified that Exhibit 2 is an amber color light normally associated with the warning of a potential hazard and he stated that it is used in coffee makers to indicate to the consumer that the hot plate or warmer is on and should be unplugged if left alone for a period of time. Exhibit 14, a Norelco coffee maker, was admitted in evidence to illustrate the amber light indicator function illuminated when the device was warm enough to commence the brewing process and remained on while the plate was hot.

The witness explained that Exhibit 3 was a 110 volt device usable with a red lens and could be used in a stove indicating that a burner is on which could be potentially hazardous if a person were not aware thereof. Mr. Kundahl testified that Exhibit 4 is a double indicator light which has been used in an air pressure system to indicate different modes of operation. The witness stated that Exhibit 4 is used in heavy machinery, for example, to indicate that large rotary blades in slicing machines are rotating which could be a potential danger as these blades are extremely quiet while in operation.

The witness explained that Exhibits 6 and 7 are used in emergency lighting systems and indicate that the system is charging its batteries and that Exhibit 7 is used in low voltage applications such as blood analyzers. According to the witness Exhibit 8 with a red lens could be used in stoves indicating that the oven is in a certain mode of operation and that Exhibit 9 is suitable for use in automotives, aircraft and marine vehicles.

Mr. Kundahl testified that Exhibit 10 is stamped with the legend "overheat" and is used in commercial cooking equipment by the Toastmaster Company and can alert the operator using a deep fat fryer, for example, that the fat is too hot thus preventing possible ignition of the fat. A long list of other lens stampings is demonstrated in Exhibit 15.

The witness stated Exhibit 11 indicates battery charging in emergency lighting systems where the AC ceases operation, that Exhibit 12 may be used in trucks (blue lens) indicating the operation of high beams and that Exhibit 13 is a warning indicator used in a counter top appliance.

The witness further testified that Exhibit 16, a light emitting diode (LED), is comparable to a neon lamp or an incandescent lamp because it emits light and, that Exhibit 17 is an accessory panel used for those who want to add optional equipment to a van, boat, etc. Further testimony merely emphasizes the wide range of uses for indicator lights.

Exhibit 18 is a catalogue published by E.M. Southwest, Inc., a distributor of a wide range of electrical items. The witness testified again as to the importance and use of indicator lights as to illustrated electrical items. Distinction was made between constantly running indicator lights,

such as those used in the following respects, viz., to show that a freezer is operating (R. 35), or, relating to burglar alarms, that a door in a large facility is secure or, that an electrical appliance is operating (Mr. Coffee), as opposed to indicator lights that engage only in an emergency situation such as sudden low oil pressure, radar detection devices or, a light that indicates a particular temperature has been reached as in an electric frying pan or soldering iron (Exhibit 28). Further testimony indicated that indicator lights may flash as in car hazard lights or reverse moving vehicle lights and that it is the wiring circuitry that determines constant operation, intermittent operation or flashing operation. Mr. Kundahl also testified that the Underwriters Laboratory encourages and often requires indicating lights on appliances.

On cross-examination Mr. Kundahl stated that the merchandise in Exhibits 1 to 13 had a specific intended use at the time it was manufactured, namely, use solely as a signalling device (R. 47). It was further borne out that the light itself has no particular application unless coupled with an item to convey information and that it would be a part of the item that the application was intended for.

Mr. Kundahl also indicated that the indicator lights in a coffee maker and crockpot do not indicate an abnormal or temporary situation but merely that the unit is functioning and is hot. Mr. Kundahl also indicated that more often than not, the imported merchandise indicates the mode of operation rather than the existence of a temporary or emergency condition.

On redirect the witness testified that the indicator lights used in abnormal, special, emergency and temporary situations are no different than those used in normal situations.

Plaintiff's final witness was Mr. Richard W. Sorenson, a full-time employee of plaintiff Carlingswitch, Inc., commencing in 1969 as an assistant treasurer and at the time of trial president of said company. Mr. Sorenson was also a vice president of SoLiCo at intervals in the 1970's. He testified that he has intimate knowledge of the Carlingswitch products and direct knowledge of SoLiCo products and their applications in 1976. The witness stated he has fourteen United States Patents on switching devices and nine patent applications pending.

The witness testified that Exhibit 20, referred to as a paddle switch or lighted mini tippette, is used with the Mr. Coffee machine, as illustrated by Exhibit 22, which employed two such switches, one for brewing and one for warming. He stated both contain indicator lights which are very important factors since the switches must be operated manually. Failure to heed the warning at the appropriate time might result in a fire, melting of the coffee maker or burns to a person not aware of the fact that the warming plate was on. He stated the manufacturer of Mr. Coffee desired that the switch include an indicator light.

The witness stated that Exhibit 21 is an illuminated rocker switch or lighted rocker switch used in the Mr. Coffee machine as illustrated by Exhibit 23. The rocker switch illustrated is a three position switch with an off setting, brewing setting and warming setting. The various settings serve the same purpose as those in Exhibit 21, namely, to prevent hazardous conditions such as fire, melting of the coffee maker and possible burns to persons operating the machines.

The witness testified that some coffee makers used separate lights and separate switches as illustrated in Exhibit 24. Mr. Sorenson further testified that many manufacturers of electrical articles use a type of device that incorporates both a switch and an indicator light. Exhibit 25 was a brochure copy of a Waring Food Processor which, the witness stated, had one lighted switch and one lighted momentary switch, comparable to Exhibit 20.

The witness further testified that Exhibits 26 and 27 were comparable in that there is one housing that encompasses both a separate switch and a separate indicator light. His testimony also states that the indicator light portion and the switch por-

tion can be separately wired and that the normal reason for combining the switch and the indicator light in a singular housing was for aesthetic purposes.

Mr. Sorenson testified that the paddle switch in Exhibit 20 is definitively a combination of an indicator light and a switch. The witness answered similarly with respect to the rocker switch illustrated in Exhibit 21. He further stated that the indicator light portion of the switches has the flexibility of being wired the same as any indicator light and wired in a manner whereby the indicator light could be off and the switch on, or vice versa, and that the indicator light could, without change in its physical construction, be wired to flash or turn on some time after the switch was turned on.

On cross-examination the witness testified that most customers purchase a non-illuminated switch and the primary market is the appliance market.

Mr. Sorenson further testified that as to Exhibits 20 and 21 if the indicator light does not work, the switch will still work but, if the switch is not working, the indicator light may or may not function depending on the wiring. Finally, the witness stated that due to the abnormal market volume of coffee making sales, the majority of indicator lights would be subject to the switch position, but that this was not the normal case.

### Indicator Lights

Plaintiff's claim to classify the indicator lights pursuant to TSUS item 685.70 is denied as the applicable statute addresses only temporary or emergency situations. Defendant demonstrates that the indicator lights in issue do not fall within the purview of TSUS item 685.70.

In *Amersham Corporation v. United States,* 5 CIT ——, 564 F.Supp. 813 (1983), aff'd., 728 F.2d 1453 (CAFC 1984), 18:12 Cust.B. & Dec. 13, this court per Chief Judge Re held that in order for an article to be classified under 685.70 certain specific criteria must be met.

\* \* \* On the other hand, item 685.70 provides for specifically named articles such as bells, sirens, indicator panels, burglar and fire alarms, and other electrical sound or signalling apparatus. In order to be encompassed with the provisions of item 685.70, it is incumbent that an article meet the following specific criteria: it must (1) be electrical; (2) alert persons to the presence of a potential hazard; (3) activate or function in temporary or abnormal situations only. \* \* \*

In *A & A International v. United States,* 5 CIT ——, Slip Op. 83–42, 17:22 Cust.B. & Dec. 58, the court reiterated this premise that TSUS item 685.70 encompasses only those devices whose function is to call attention to temporary or abnormal conditions. Applying this test the court found that metal detectors were properly classifiable under TSUS item 685.70 as they signalled the user of the existence of a temporary condition, i.e., the presence of metal.

In *Oxford Industries v. United States,* 75 Cust.Ct. 58, C.D. 4608 (1975), the court held that bicycle taillights (illuminators) were not classifiable under TSUS item 685.-70 because they operated continuously and did not warn of the existence of emergencies or special circumstances.

The evidence of record indicates that plaintiff has failed to overcome the presumption of correctness which attaches to the classification decision of customs officials. Of course, if it appears that an erroneous classification has been made by Customs, a correction thereof, can be made pursuant to 28 U.S.C. § 2639(a)(1).

The testimony of Mr. Kundahl shows that a large portion of the imported merchandise operates continuously to indicate heat (as in the coffee makers), coldness (as in the case of refrigeration), or that more often than not, a mode of operation as in the functioning of a crockpot or that heavy machinery is in operation.

Overall, the testimony clearly indicates a wide range of usage for the merchandise in issue more of which is used in a continuous operation stage rather than in a temporary alertness type mode of operation. The cases both from this court and the appellate courts strongly construe the

necessity of temporary operation to alert an emergency condition. The presumption afforded customs officers must be upheld especially where there is a lack of preponderance of evidence on those challenging the decision. *New York Merchandise, Inc. v. United States,* 59 CCPA 127, C.A.D. 1052, 459 F.2d 1047 (1972).

### Lighted Switches

■ Plaintiff's claim to classify the lighted switches pursuant to TSUS item 688.40 is likewise denied. Again, plaintiff has failed to overcome the presumption of correctness which attaches to the classification of customs officials, 28 U.S.C. § 2639(a)(1).

The lighted switches were produced for sale to the manufacturer of Mr. Coffee machines. These lighted switches consist of assemblies of toggle and rocker switches and indicator lights. As combination articles, plaintiff contends they serve a dual purpose as being a switch and a light. The switch portions function to make, break and change connection in the electrical circuits of the coffee makers while the indicator light portions serve to provide notice to the users of the brewing and warming operations.

Plaintiff contends that the light switches consist of indicator lights and switches which have separate, significant, co-equal functions thereby removing them from the common meaning of either a switch or an indicator light. Consequently, plaintiff contends they are "more than" a switch or an indicator light and are classifiable neither as a switch nor indicator light but, properly classifiable as electrical articles not specially provided for.

Defendant argues that the majority of the imported switches had the primary switching function of opening and closing circuits, and an incidental function subordinate to the actual switching function of indicating by activation of a light incorporated in the switches' housing regardless of whether the switch was opened or closed.

■ In customs jurisprudence it is well-settled that where an article has both a primary function and an incidental function subordinate to the primary function, the primary function governs classification. *Trans-Atlantic Co. v. United States,* 60 CCPA 100, C.A.D. 1088, 471 F.2d 1397 (1973); *E. Green & Son v. United States,* 59 CCPA 31, C.A.D. 1032, 450 F.2d 1396 (1971); *Tridon, Inc. v. United States,* 5 CIT ——, Slip Op. 83–36 (1983).

■ Equally well-settled is that a combination or multifunctional article is not classifiable under a specific statutory provision which describes only one of its features or functions as the importation is "more than" the article described. *Sanyo Electric, Inc. v. United States,* 84 Cust.Ct. 167, C.D. 4855, 496 F.Supp. 1311 (1980), aff'd. 68 CCPA 14, C.A.D. 1258, 642 F.2d 435 (1981). The same holds true as to combination articles both of whose functions are co-equal, which essentially makes the total article "more than" either of its components. *Gallagher & Ascher Company v. United States,* 63 Cust.Ct. 223, C.D. 3899 (1969).

■ Reviewing the testimony and evidence of record the court finds that the functions are not equal and that the primary purpose of the lighted switch is its switching function to control the flow of current to the particular appliance. The indicator light is subordinate to the switching function.

Plaintiff's witness, Mr. Sorenson, testified that he would define a switch as a device which performs the function of opening or closing a circuit. It is evident from the merchandise introduced in evidence, primarily Mr. Coffee machines, for which a majority of these lighted switches were produced, that the switch performs that primary function by either allowing or disallowing current to the particular device. Without electric current coffee could not be brewed by a Mr. Coffee machine.

Furthermore, the same witness distinctly testified that the indicator lights do not function if the switch is not in the "on" position and stated that if the indicator light was not functioning the appliance nonetheless would function. (R. 86). It also appears from the testimony that the

switch itself indicates whether it is open or closed merely by the position of its activator. The indicator lights in such instance would merely duplicate the function of telling the operator that the appliance is in operation although they make it easier for the user to ascertain whether the switch is open or closed. The switching function is the key element in the lighted switches device.

### Conclusion

Plaintiff has failed to demonstrate that the indicator lights in issue function only in temporary or emergency conditions which case law has clearly established to be the proper test. Indeed, the testimony bears out the fact that many indicator lights function constantly.

As to the lighted switches plaintiff has failed to demonstrate that the indicator light functions in a co-equal capacity to establish that the total article is "more than" either of its components.

Accordingly, the classification of the District Director of Customs at the Port of Brownsville, Texas is sustained and the complaint is, in all respects, dismissed.